902 A.2d 152

MARYLAND CASUALTY COMPANY

v.

Phillip HANSON et al.

No. 819, Sept. Term, 2005.

Court of Special Appeals of Maryland.

July 3, 2006.

Linda S. Wolf, Kamil Ismail, George S. Mahaffey, Jr., Goodell, DeVries, Leech & Dann, L.L.P., Baltimore, for Appellant.

Paul J. Weber (Hyatt, Peters & Weber, L.L.P., on the brief), Annapolis, for Appellees.

Panel: DAVIS, KRAUSER and BARBERA, JJ.

DAVIS, Judge.

Maryland Casualty Company, appellant, files this appeal from a Declaratory Judgment Order issued by the Circuit Court for Baltimore City (Matricianni, J., presiding). The court found that appellant was liable for insurance coverage under six separate policies for injuries that children of a tenant suffered as a result of lead-based paint poisoning at a property that appellant insured for a property management

company and the tenant's former landlord. Appellant presents three issues for our review:

1. Did the trial court err in its May 3, 2005 Declaratory Judgment Order in concluding that continuing exposure to lead-paint at the same property over multiple Policy years constituted multiple occurrences despite Policy language that "[a]ll bodily injury . . . resulting from . . . continuous or repeated exposure to substantially the same general conditions shall be considered to be the result of one occurrence"?

2. Did the trial court err in its May 3, 2005 Declaratory Judgment Order in holding that the limitation of liability language in the Policy provisions was ineffective to preclude "stacking" of occurrence limits in Policies covering successive years and triggered by a "continuing injury"?

3. Did the trial court err in its May 3, 2005 Declaratory Judgment Order in holding that coverage for later years were [sic] triggered by injuries that had already manifested and been diagnosed prior to the inception of such coverage?

We answer all three questions in the negative. We shall affirm the decision of the circuit court, but nevertheless, remand for entry of a declaratory judgment in accordance with the Maryland Rules.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellant's appeal of its declaratory judgment action before the circuit court is part of an underlying personal injury tort claim. Antonio Jones and Ericka Jones [1] (Jones children), by their mother, Carrie Holmes, and Holmes individually, sued Mid–Atlantic Funding Company, Darius Funding, Inc., and Phillip Hanson. Hanson was an insured of appellant. The Jones children allege they suffered lead-induced injuries as a result of their exposure to lead-based paint while tenants at real property owned by Hanson and located at 1229 North

---

1. Antonio Jones was born August 1, 1983 and moved to the Property as an infant, while Ericka Jones, born on November 1, 1985, resided at the Property from birth.

Central Avenue in Baltimore City (the Property). Holmes and the Jones children resided at the Property from May of 1984 through 1990, and the children were diagnosed with the following elevated blood-lead levels measured in micrograms (μg) per deciliter (dL) of blood.[2]

### Antonio Jones

| Date | Blood-Lead Level |
|------|------------------|
| October 17, 1986 | 37 μg/dL |
| December 10, 1986 | 33 μg/dL |
| December 30, 1986 | 34 μg/dL |
| January 20, 1987 | 34 μg/dL |
| April 2, 1987 | 38 μg/dL |
| March 11, 1988 | 32 μg/dL |
| August 8, 1988 | 62/59 μg/dL |
| October 5, 1988 | 39/41 μg/dL |
| March 6, 1989 | 33 μg/dL |

### Ericka Jones

| Date | Blood-Lead Level |
|------|------------------|
| October 17, 1986 | 25 μg/dL |
| December 10, 1986 | 19 μg/dL |
| December 30, 1986 | 21 μg/dL |
| January 20, 1987 | 22 μg/dL |
| April 8, 1987 | 28 μg/dL |
| November 16, 1987 | 32 μg/dL |
| January 27, 1988 | 26 μg/dL |

2. *Riley v. United Services Auto. Ass'n*, 161 Md.App. 573, 577, 871 A.2d 599 (citing Scott A. Smith, *Turning Lead into Asbestos and Tobacco: Litigation Alchemy Gone Wrong*, Defense Counsel Journal, Apr. 2004, at 123). We also noted that:

As medical research has progressed, what experts consider to be a 'safe' lead level has consistently dropped:

Prior to 1970, the U.S. Surgeon General defined the "level of concern" of lead in a young child's blood as 60μg/dL, a level rarely seen today. In 1970, the Surgeon General reduced the level of concern to 40μg/dL. In 1978, the Centers for Disease Control and Prevention (CDC), having assumed jurisdiction over lead poisoning prevention from the Surgeon General, further reduced the level of concern to 30μg/dL; in 1985, to 25μg/dL; and in 1991, to 10μg/dL, where it stands today.

*Id.* (quoting at 123).

| March 11, 1988 | 29 μg/dL |
|---|---|
| July 28, 1988 | 40/44 μg/dL |
| August 8, 1988 | 40/44 μg/dL |
| January 5, 1989 | 27 μg/dL |
| February 1, 1989 | 25/20/22 μg/dL |

Appellant issued separate liability insurance policies, three each to Hanson and Consumer Management Corporation (CMC), the property management company for the Property, during the Jones children's tenancy that covered 1985–1990. CMC's insurance policies were in effect during the following periods:

• October 1, 1985 to October 1, 1986

• October 1, 1986 to October 1, 1987

• October 1, 1987 to October 1, 1988

Hanson's policies covered:

• March 2, 1987 to March 2, 1988

• March 2, 1988 to March 2, 1989

• March 2, 1989 to March 2, 1990

The coverage dates for the second and third CMC policies and the first and second Hanson policies overlapped from March 2, 1987 to October 1, 1988. Each of the six policies contained a policy limit of recovery totaling $500,000.

The primary controversy devolves upon how the policies should be construed and accordingly, the amount of coverage, if any, of the policies. On August 18, 2004, appellant filed a Complaint against appellees Hanson, Holmes and the Jones children seeking declaratory relief and interpretation of the policies. Appellant argued that coverage for the alleged injuries suffered by the Jones children should be denied because they were seeking damages in their tort lawsuit in excess of the $500,000 limit of the Hanson policies. Appellant also contended, in the alternative, that coverage under the second and third Hanson policies should be denied because the injuries alleged by the Jones children occurred prior to the inception of those policies. Additionally, Hanson's knowledge of the injuries constituted a known loss which, appellant averred, precluded coverage.

On March 2, 2005, appellant moved for summary judgment, reiterating its argument from its Complaint. Appellant also claimed that it was entitled to a declaration that coverage was only available under one of the three CMC policies because Holmes and the Jones children allege one occurrence of the lead-based injury, the policies limit coverage per occurrence, and the "bodily injuries alleged ... manifested and were a known loss prior to the inception of the [third CMC policy]." Appellees countered that there were several facts in dispute and that the court should deny appellant's motion. On March 30, 2005, the court conducted a hearing (Pierson, J., presiding), and denied appellant's motion.

The court then conducted a bench trial on April 28, 2005. The parties stipulated to the blood-lead levels listed above, appellant's issuance of the subject policies and the "relevant terms" contained therein to Hanson and CMC, and the declaration pages listing $500,000 as the policy limit. The parties also agreed that Peter and Julia Ben Ezras [3] "were listed as additional insureds on one or more of the policies issued by [appellant to CMC]," and that if Hanson were called to testify at trial, he "would testify that he did not receive notice of the alleged exposure to lead paint of [the Jones children] on the premises. of [the Property] until he was served with the Complaint in the underlying [tort] action in 1995."

Appellant presented the following arguments at trial:

... There are two policy lines here. One is a series of three policies that were issued to [CMC]. And the first policy was issued 10–1–85 to '86. There was the second [CMC] policy which was 10–1–86 to '87, and then 10–1–87 to '88. So there's three [CMC] policies. They're the earlier in

---

3. Appellant amended its Complaint on September 9, 2004 and October 14, 2004 to add CMC and Peter and Julia Ben Ezra as defendants, respectively. Because CMC had "no substantial assets other than its right to insurance coverage," and because appellant failed to obtain service upon the Ben Ezras, the court, pursuant to Rule 2–507, filed a Notice in Contemplation of Dismissal in February 2005 regarding appellant's case against CMC and the Ben Ezras, without prejudice, for lack of jurisdiction.

time. All of them would ensure liability arising from conditions on the premises of 1229 Central Avenue.

The second line of policies which I'll call the Hanson line of policies, they incept later. 3–2–87 is the date of issuance of the first Hanson policy and that runs 3–2–87 to '88 and the middle policy, 3–2–88 to '89, and then a third Hanson policy, 3–2–89 to '90. . . .

Your Honor, it is necessary to juxtapose the lead test which are also part of these stipulations with the policy periods. And significantly the first lead test does not occur and there is no lead reading for either of [the Jones children] before 10–17–86. That is after the first [CMC] policy expired. So our position is that there is no coverage under the [first CMC] policy. There is no evidence at all in this case that there was injury during that policy period or that there was any occurrence that could trigger that policy.

THE COURT: You're talking about if we say there are three policies to [CMC], you're talking about just the first of those or all three of them?

[Appellant's counsel]: I'm talking about—I'm focusing now just on the first [CMC] policy, the—

THE COURT: The one that ran from '85 to '86.

[Appellant's counsel]: That's correct. Because there's no evidence of any elevated lead level of injury in that policy period, and this is in the current (inaudible) policy.

Your Honor, the lead levels which are shown on th [sic] the graphs then span from October 17 of '86 and in the case of Erica [sic] [Jones], the last reading is in February of '89. In the case of Antonio [Jones], the last reading is in March th [sic] actually March 6 of '89.

With respect to the Hanson policies, Your Honor, both of [the Jones children] were diagnosed with lead injury before the first Hanson policy was issued. They were diagnosed and had a number nd [sic] of lead readings prior to March 2 of 1987. So with respect to the Hanson policies, it is [appellant's] position that there is no coverage available because at the time the first Hanson policy

issued, there was no fortuitous event that could occur, rather the injury had been-the lead paint elevated lead levels had been diagnosed.

And Your Honor, this is not a matter of manifestation trigger, and I'm steering away from the use of manifestation because this is a different issue. This is known loss and fortuity. And in this case, we have the [Jones children] in a brief to the Court of Appeals saying that [CMC] knew of the presence of lead and the fact that children had been exposed to lead and injured by lead in 1986 and prevailing on that argument in the Court of Appeals.

And now they're going to stand up and alleging it in their complaint and attempting to prove it all throughout the 10 years or so of this case. And now they're going to stand before you and tell you that there was no known loss here. Your Honor, we don't believe that a party should be allowed to blow hot and cold as it benefits them in litigation. And we do not-we believe that [Holmes and the Jones children], are estopped from arguing against the proposition that they state in their brief in the Court of Appeals that Ms. Holmes testified to under oath in her deposition that's alleged in their complaint. And that is that [CMC] knew of the lead injury in 1986, that it was the agent for [Hanson], and that his knowledge is imputed to [Hanson] [sic].

This is an argument being made against [Holmes and the Jones children], and we believe that under the *Kramer v. Globe Drilling* case and the cases that follow it, [Holmes and the Jones children] are judicially estopped making it contrary to this case.

THE COURT: What's the consequences of that with respect to this [sic] last two policies of [CMC]?

[Appellant's counsel]: ... With respect to the last two policies of [CMC], it is [appellant's] position that the limit of liability provision in those policies limit the availability of coverage to one per occurrence limit which is $500,000.

And alternatively with respect to the Hanson policies, it is [appellant's] position that if this Court finds that there is coverage available at all under the Hanson policies, notwithstanding the fact that this was a fully manifested and diagnosed injury prior to the first policy being issued, that limit of liability provision in the Hanson policy similarly limits the availability of coverage under those policies to one $500,000 per occurrence limit.

And for the Court's purposes, the pertinent language in the [CMC] policy which is found in the coverage part that Your Honor has says, "For the purpose of determining the limit of the company's liability, all bodily injury and property damage arising out of continuance [sic] or repeated exposure to substantially the same general condition shall be considered as arising out of one occurrence." Your Honor, that language is particularly applicable to a situation here where the allegations are that these children were injured by continued or repeated exposure to one condition, and that's the presence of lead—chipping and peeling lead paint at [the Property].

All of the allegations in the complaint and all the claims in the case arise from one condition. And it is the position of [appellant] that the anti-stacking provision, the limit of liability language in their policies deem that—all of their injuries combined to one occurrence, subject to one per occurrence limit per policy line.

Now Your Honor, that outcome is absolutely consistent with the Court of Appeals opinion in the *CSX Transportation v. Continental* case at which time the Court of Appeals, Judge Bell, held that in order to determine the number of occurrences under Maryland law in the vast majority of courts that have considered that issue, one looks to the cause of the injury. And this is not—the holding in CSX is absolutely consistent with the limits of liability provision, but it is Maryland common law. And under the Court of Appeals binding decision in CSX, it was held that in that case, it was a noise induced hearing loss case. And in that case, the Court held that the

sources of noise determined the number of occurrences, so it would be the source of the injury, the cause of the injury. And the CSX case is very clear about that. This case made one cause of the injury, chipping and peeling paint, so even if the policies didn't include the anti-stacking provision, we have one cause of injury, one occurrence, and it's the chipping and peeling paint at [the Property].

So Your Honor, we say under CSX, there was only one occurrence here. Under each policy line, we say that the limit of liability provisions in each policy also preclude there being more than one occurrence limit available. We say that there is no coverage available under the Hanson policies for injuries that were diagnosed and manifested prior to any of those policies being issued, and alternatively under the Hanson policies at most there would be only one per occurrence limit available.

And Your Honor, we also say that under the Riley case, under Bausch & Lombe [sic], under Hartford [sic] Mutual, [Hanson, Holmes and the Jones children] had the burden of proving injury in a policy period and could only do that through expert testimony which was not presented in this case, and therefore they've not proven injury in any policy period. Thank you, Your Honor.

Counsel for Holmes and the Jones children responded:

First I want to talk to you about the last thing [counsel for appellant] talked about which is the so-called burden of proof issue. Your Honor, the case law is (inaudible) that who has the burden of proof depends on the state of the pleadings and fundamental fairness. And Your Honor, in this case, [appellant] came into court and told the Court that the issue of whether the complaint of injuries occurred under any of the covered policy periods has not been raised. And it is [appellant's] position, not to them, that this factual issue would be resolved in the underlying tort case and is therefore improper to address herein. Talk about going hot and cold, now we're coming into court and saying, oh, I didn't mean what I said. [Holmes and the Jones children] do have

the burden of proof. They do have to prove injury during the policy periods in this case. Well, they can't have it both ways, Your Honor.

[Holmes and the Jones children] do not have the burden of proof in this case. [appellant] has the burden of proof in this case. They're coming to court and saying Your Honor, we want a declaration that we don't have to provide coverage. Why don't we have to provide coverage? Because there hasn't been an occurrence during each policy period. Why hasn't there been a [sic] occurrence during each policy period? Because they can't prove injury. Well, they have to come into court and prove those things . . . .

[appellant] can't have it both ways. They can't say it hasn't been raised. It's a matter for the tort case. And they come in on the day of trial and say, yes, you got to prove it. So that's the procedural issue that I think the Court needs to consider.

Now Your Honor, the Riley case looked at this exact policy language virtually. And what [appellant] failed to acknowledge I guess is that this—each of these policies cover bodily injury during the policy period. That's the [CMC] language. The Hanson policy talked about the endorsement period, but it's the same thing. If there is bodily injury during a policy period, then the coverage is triggered. It's our allegation that there has been a bodily injury during each policy period. And therefore, all six of these policies are triggered.

. . . The first argument [counsel for appellant] talked about is the fortuity, or the known loss argument, which I believe applies to the Hanson policies, [counsel] argues, in that the argument is, well, because these children had been poisoned by lead prior to the time that the Hanson policies had been incepted, it's not a known loss and therefore there can be no coverage under those policies.

The problem is, Your Honor, is that that argument ignores the language of the policies themselves which says that if there is a bodily injury during a policy period, there has been an occurrence. And it's our proffer to the Court,

a, that they did not meet their burden and prove there wasn't a bodily injury during each of these policy periods, or in the alternative, that there will be proof that there was bodily injury during each of these policy periods in the underlying tort case. But again, Your Honor, we assert that the declaration is to be made today because [appellant] as the moving party [has] not met [its] burden of proof as to lack of bodily injury during a policy period.

But regardless, it's irrelevant whether there was a poisoning prior to the time the Hanson policy incepted. Because think about it this way, Your Honor. Suppose, as pretty much occurred in this case, that a new landlord bought the property mid-stream during a tenant's tenancy. And the tenant had levels prior to the time the tenancy begins and continued to have elevated levels after the new ownership took place. And that new owner had an insurance policy. Do you think that the insurance company could come into court and say, well, these kids had lead levels before? We don't care if you were negligent and allowed chipping and peeling paint to remain in the property and allowed them to continue to be exposed to lead. They already had lead poisoning before you took possession of the property, and before you bought our policy, so therefore we're not going to provide coverage. That makes no sense, and that's pretty much an argument that Riley—you'll see when you read the case—addresses.

Riley talks about a situation a little bit different when there's four consecutive policy years but four different insurance companies that provide the coverage. And they said pretty much the same argument, that there would be coverage under those situations, even if it was four separate carriers. And that's what we have here. We have a landlord who took possession of the property. He had an insurance company. The kids were still being exposed to lead. It doesn't matter, Your Honor. There's still an occurrence. There's still bodily injury during the policy period.

I've argued this same case with [counsel for appellant]. I think this is the third time now. She does a great job of trying to take one argument and segregate it into four separate arguments, but really it's the same. Was there a bodily injury during the policy period? If there is a bodily injury during the policy period, then the policies are triggered. Known loss is irrelevant. Otherwise the Riley case would not mean anything because they said across successive policies they stacked. And therefore, if policies stacked, they stack. [Hanson's] knowledge of what the injury [was to the Jones children] is irrelevant to this analysis.

So [counsel for appellant's] argument concerning judicial estoppel I'll address and say I don't believe we are estopped. These are mere allegations. Pleadings can be made in the alternative. And number one, it's not—it's the testimony of [Hanson and CMC] who are saying they didn't have knowledge. It's not Ms. Holmes saying I am now changing my mind and saying I did not notify them. It's the testimony that was introduced in the deposition of Mr. Caplan [of CMC], and the stipulation of Mr. Hanson, and then the subsequent stipulation again of Mr. Caplan to say I didn't have notice. It's not us taking a different position at all. It's [Hanson and CMC] taking the same position they've taken all along. That's evidence in this case, and [Holmes and the Jones children], have a right to rely on that. So that addresses the known loss.

I don't think it's irrelevant. If Your Honor does find it's relevant, I don't believe we're barred by judicial estoppel from asserting that [Hanson and CMC] argued that there was no notice.

Your Honor, with regard to the CSX case, Your Honor, the CSX case was a case where a railroad, CSX, had a policy—they were self-insured. But they had a retention limit where they would pay the first part, and then the carrier would come in and pay anything over a certain dollar amount of claim for each claim that was made. And what occurred was there was a huge, huge number of hearing loss

claims from railroad workers being injured in the yard. The railroad wanting all those claims to be one occurrence said this is one occurrence. Therefore, we only have to pay our self-retention limit once, and then you, insurance company, have to pay the remainder of all these claims. On the other hand, the carrier argued that each individual worker's hearing loss claim was a separate claim, and that the self-insured retention limit as to each individual claim would have to be paid by the railroad before the insurance would kick in.

And indeed the Court of Appeals, Judge Bell, did say that in those circumstances, the cause test did apply. However, Your Honor, the case is distinguishable because that did not deal with coverage across successive policy periods, okay? That each individual railroad worker, yes, indeed was a different claim. That's all the case held.

Utica Mutual case, Your Honor, the Harford County case, Your Honor, the Riley case, Your Honor, are all individual—I'm sorry—are all environmental exposure cases where it would specifically [sic] that environmental injury, and now the Riley case, lead paint injury across successive policy periods, the policies stack. CSX was not a stacking case, Your Honor. It simply wasn't.

With regard finally, Your Honor, to the limits of liability provision. On that, Your Honor, I believe the Riley case is indeed on all force [sic]. Bodily injury during a policy period shall be one occurrence. And if there's a bodily injury during a subsequent policy period, that's one occurrence. And if there's another policy period and a bodily injury during that policy period, that's an occurrence. These are occurrence policies. When you read my memorandum that was attached to my motion for summary judgment, Your Honor, it outlines pretty well the history of trigger law, for lack of a better way to put it, in insurance cases in this state.

The cases that said that manifestation is the sole trigger are no longer good law. And I outline all those cases.... Riley specifically said that in this exact circumstance, the

policies stacked. For all those reasons, Your Honor, I request that you issue a declaration that there is coverage under all six of these policies, and that [appellant] must indemnify [Hanson and CMC] in the tort case equivalent. Thank you.

Counsel for Hanson maintained that

... the only evidence before Your Honor is that the insured, the person that contracted with the insurance company, did not have knowledge of the situation and therefore it was not a known loss.

With regard to the Hanson policies, if you note the times of exposure with regard to Antonio Jones and Erica [sic] Jones, Antonio Jones has actual lead levels in each of the three policy periods for Hanson. With Erica [sic] Jones, there are lead levels in two, the first two, of the Hanson policy periods, two different policies.

With regard to the third, again I believe that that issue still has to be determined by expert testimony and may in fact be provided at the underlying tort litigation. But we have all three policies in play with regard to Antonio Jones and two of the three just using the lead levels with regard to Erica [sic] Jones.

From the insured's point of view with regard to the so-called stacking issue, Riley.... If indeed Mr. Hanson had gone to three separate insurance companies during these three years of policy coverage, would it be that he had only one limit of liability? If indeed he stayed with the same company, should he be prevented from having the policy limits for each of those three policies?

The language in those policies would have to be pretty stringent to prevent him from receiving the same coverage if he had gone to three different insurance companies. And with regard to this policy, I don't believe that language is there to give the insurer the notification that if indeed he wants coverage in those policy limits for each of those claims during each of those policy years, he has to go to three separate insurance companies. The language just

isn't strong enough to state that is what he would have to do to get the coverage that he thought he had.

It would just be blatantly unfair for an insured if indeed he had coverage for 20 years if he stayed with the same company, due to loyalty or price or whatever, that he would have one policy limit for the entire 20–year period. . . .

On May 3, 2005, in its Declaratory Judgment Order, the court ruled:

Pursuant to Md.Code Ann., *Cts. and Jud. Proc.* § 3–406 this Court has jurisdiction to construe written contracts and to declare the rights and obligations of the parties under the contracts. *See Chantel Assocs. v. Mt. Vernon Fire Ins. Co.,* 338 Md. 131, 142, 656 A.2d 779 (1995).

While [appellant], has not asked this Court to consider its duty to defend the underlying tort action, styled as *Antonio Jones, et al. v. Mid–Atlantic Funding Company, et al.,* Case No. 94125016/CL 180144, it does seek to have this Court declare that there is no available coverage under its applicable policies for damages alleged therein.

[Appellant] insurer insists that it is entitled to judgment in its favor because [Appellees], Phillip Hanson, et al., have failed to prove that any actual injuries occurred during any of the operative policy periods under six separate insurance policies related to the premises in question in the tort action. Although this Court has limited authority to determine independent and separate questions of policy coverage prior to the tort trial, the issue of whether the present claims fall within the potential coverage of any of these policies depends on a factual issue that must be resolved in the underlying tort suit. *7416 Baltimore Ave. v. Penn–America,* 83 Md.App. 692, 697–701, 577 A.2d 398, *cert. denied,* 321 Md. 164, 582 A.2d 499 (1990).

In the present action, the Court finds that the parties have presented a justiciable controversy concerning [appellant's] duties and obligations under each of the six policies in question, which involves issues independent and separable from the claims of [Holmes and the Jones children]. *See*

*Howard v. Montgomery Mutual Ins. Co.,* 145 Md.App. 549, 560, 805 A.2d 1167[,] *cert. denied,* 372 Md. 431, 813 A.2d 258 (2002). The issues to be resolved here involve the number of "occurrences" at issue where [the Jones children] claim, continuous or repeated exposure to lead paint over the course of several policy periods; whether the Limit of Liability provisions in the policies preclude stacking of policies issued to a single insured; and whether coverage is available under any policy issued after the claimed injuries were diagnosed.

Based on the record before the Court and its review of the relevant authorities, the Court is persuaded that exposure to lead paint plus proof of bodily injury constitutes an "occurrence" under each of the insurance policies in question, which would give rise to coverage. Moreover, the Court believes that the Limit of Liability provisions in the policies do not preclude stacking each of their liability caps upon proof of continuing exposure and bodily injury during sequential policy periods. Finally, the Court holds that [Hanson and CMC's] "known loss" is not determinative of liability coverage for policy periods after [the Jones children's] initial blood-lead level diagnosis in October, 1986. Again, the Court declares that the test for coverage under any one of the six insurance policies here is exposure to lead paint plus proven bodily injury during the relevant policy period. *Cf. Riley v. United Services Automotive Assoc.,* [161 Md.App. 573, 871 A.2d 599,] 2005 WL 742896 (Md. App.[2005]) and cases cited therein.

Accordingly, the court declares that the Limit of Liability provisions in the three Hanson insurance policies and in the three [CMC] policies limit coverage to one occurrence for bodily injury resulting from continuous or repeated exposure to lead paint for each of the six relevant policy periods. The court further declares that these provisions do not preclude stacking of the liability caps if [the Jones children] can prove continuing exposure and bodily harm during more than one policy period. Finally, the Court declares that

"known loss" is not determinative of the availability of coverage for any of the applicable insurance policy periods.

Therefore, [Hanson, CMC, Holmes and the Jones children's] access to insurance coverage under any one of the six policies in question here will, of necessity, be determined in the underlying tort action. (Footnote omitted.)

Appellant's timely Notice of Appeal to this Court followed.

## STANDARD OF REVIEW

When an action has been tried without a jury, the appellate court reviews the case on both the law and the evidence. *Md. Rule* 8–131(c)(2006). We "will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." *Id.* As Judge Thieme, writing for the Court, explained, "[t]he trial court is thus the gatekeeper for receiving and weighing the evidence. In contrast, we are bound by the trial court's evidentiary findings, and we will not disturb those findings on appeal if they have support in any competent material evidence, even if we would have reached a different conclusion regarding that evidence." *Brown & Sturm, et al. v. Frederick Road Ltd. P'ship, et al.,* 137 Md.App. 150, 170, 768 A.2d 62 (2001) (citation omitted).

## DISCUSSION

Appellant argues that the circuit court erred by concluding that the Jones children's exposure to lead at the Property over several years constituted multiple occurrences over the applicable insurance policies. Appellant specifically posits that the policy language, reviewed in conjunction with case law, should have led the court to conclude that the Jones' exposure amounted to a single occurrence, and that the policy language precluded the 'stacking' of the occurrence insurance limits. Additionally, appellant contends that the court erred in finding that insurance coverage is available despite the lead-induced injuries being diagnosed and known to Hanson, as landlord, and CMC, as property manager, prior to the inception of

coverage. We shall affirm the judgment of the circuit court, but remand the case for the purpose of issuance of a separate order.

**I**

■ In order for courts to interpret and determine coverage under insurance policies,

the primary principle of construction is to apply the terms of the insurance contract itself. In doing so, we ascertain the parties' intentions from the policy as a whole. In construing the terms of the insurance contract, unless there is an indication that the parties intended to use words in the policy in a technical sense, we accord the words their usual, ordinary, and accepted meaning.

*Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.*, 355 Md. 566, 581, 735 A.2d 1081 (1999) (citations and internal quotation marks omitted). Ambiguity arises if, "to a reasonably prudent layman, the language used is susceptible of more than one meaning." *CSX Transp., Inc. v. Cont'l Ins. Co.*, 343 Md. 216, 249, 680 A.2d 1082 (1996) (citation omitted). The matter of determining whether an "insurance policy is ambiguous is a threshold matter which is to be decided by the court as a matter of law." *Id.* (citation omitted).

■ Generally, insurance policies based on occurrences, like the policies at issue here, as opposed to claims or discovery[4] insurance policies

cover liability inducing events occurring during the policy term, irrespective of when an actual claim is presented. As to the use of "occurrence" policies, we further observed in [*Mutual Fire, Marine & Inland Ins. Co. v.*] *Vollmer,* 306 Md. [243] at 255, 508 A.2d 130, [(1986)] that in the area of environmental contamination it is nearly impossible to identify the time of the tortious "occurrence" and the effect of

---

**4.** *"A "claims made" or "discovery" policy covers liability inducing events if and when a claim is made during the policy term, irrespective of when the events occurred." Harford County, 327 Md. at 435, 610 A.2d 286 (citation omitted).*

long-term exposure upon the character of the injury, citing *Stine v. Continental Casualty Co.*, 419 Mich. 89, 349 N.W.2d 127 (1984). Similarly, in *Zuckerman v. National Union Fire Insurance Co.*, 100 N.J. 304, 312, 495 A.2d 395, 399 (1985), which we referred to in *Vollmer*, the court observed that in the use of "occurrence" policies for perils that can cause latent damage, as in environmental litigation, there is a difficulty in determining precisely when the essential causal event occurred.

*Harford County v. Harford Mut. Ins. Co.*, 327 Md. 418, 435, 610 A.2d 286 (1992) (citation and footnote omitted).

## II

### a. Occurrence and Trigger

The crux of appellant's argument is that, in consideration of the policy language and lead-induced injuries, if the Jones children are entitled to coverage, they should only receive insurance coverage for a single occurrence of exposure to lead, and not several occurrences over multiple years, thereby triggering coverage under the successive policies and cap limits. Looking to the pertinent language of the policies, each of the CMC policies contain the following definitions:

*Limits of Liability*

Regardless of the number of (1) insureds under this policy, (2) persons or organizations who sustain bodily injury or property damage, or (3) claims made or suits brought on account of bodily injury or property damage, the company's liability is limited as follows ...

For the purpose of determining the limit of the company's liability, all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

*Bodily Injury*

Bodily injury means bodily injury, sickness or disease sustained by any person which occurs during the policy period....

*Occurrence*

Occurrence means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

Appellant's policies issued to Hanson each included the following language:

*Limit of Liability*

Regardless of the number of insureds, claims made or persons insured, our total liability under Coverage L [for Premises Liability] stated in this endorsement for all damages resulting from any one occurrence shall not exceed the limit of liability for Coverage L stated in the Declarations [of $500,000]. All bodily injury and property damage resulting from any one accident or from continuous or repeated exposure to substantially the same general conditions shall be considered to be the result of one occurrence.

*Bodily Injury*

"bodily injury" means bodily harm, sickness or disease, including required care, loss of services and death resulting therefrom.

*Insured Location*

"insured location" means the one to four family dwelling, other structures and grounds shown as the residence premises in the Declarations.

*Endorsement Period*

This endorsement applies only to bodily injury or property damage which occurs during the period this endorsement is in effect.

With respect to occurrences, appellant maintains that courts in Maryland, specifically the Court of Appeals in *CSX, supra,* and decisions in other jurisdictions "are near-uniform in construing policy provisions like those at issue here to limit coverage to amounts available for a single occurrence." We disagree.

Preliminarily, we address the critical principle of trigger within the context of insurance coverage.[5] Chief Judge Joseph Murphy, writing for this Court, reiterated:

"Trigger is a legal rule designed to determine when a policy must respond." James M. Fischer, *Insurance Coverage for Mass Exposure Tort Claims: the Debate over the Appropriate Trigger Rule,* 45 Drake L.Rev. 625, 652 (1997).

The policies do not refer to a "trigger"; "the term 'trigger' is merely a label for the event or events that under the terms of the insurance policy determines whether a policy must respond to a claim in a given set of circumstances." *Owens–Illinois, Inc. v. United Insurance Co.,* 138 N.J. 437, 447–48, 650 A.2d 974, 979 (1994) (citing Robert D. Fram, *End Game: Trigger of Coverage in the Third Decade of CGL Latent Injury Litigation,* in 10th Annual Insurance, Excess, and Reinsurance Coverage Disputes 9 (PLI Litig. & Admin. Practice Course Handbook Series No. 454, [454 PLI/Lit 9] 1993)("Fram")).

Although the CGL policy is essentially a standard form, divergent theories have been applied to the trigger of coverage. In *Owens–Illinois,* the New Jersey Supreme Court reviewed a number of theories for the trigger of policy coverage, stating:

The most frequently offered theories for the trigger of coverage are (1) the exposure theory, (2) the manifestation theory, and (3) the continuous-trigger theory ... [and] [a]t least two other less-frequently followed theories exist. One is the "injury-in-fact" (or "damages-in-fact") approach, which holds that coverage is triggered by a showing of actual injury or damage-producing event.... Under that theory, coverage is triggered by "a real but

---

**5.** "Resolving the issue of when coverage is triggered is important because only a triggered policy potentially covers the injury. Courts have concluded that exposure, latency, occurrence of the injury, or manifestation—and even combinations of these—will "trigger" coverage." Lee H. Ogburn, *The Progression of Trigger Litigation in Maryland—Determining the Appropriate Trigger of Coverage, its Limitations, and Ramifications,* 53 Md. L.Rev. 220, 222 (1994).

undiscovered injury, proved in retrospect to have existed at the relevant time * * * irrespective of the time the injury became manifest." ... [A]fter an injury ... it may be inferred ... that the harm actually began sometime earlier ... [and f]inally, the "double-trigger" theory holds that injury occurs at the time of exposure and the time of manifestation, but not necessarily during the intervening period. *Id.,* 138 N.J. at 449–51, 650 A.2d at 980–81 (citations, footnotes and internal quotations omitted).

*Mayor and City Council of Baltimore v. Utica Mut. Ins. Co.,* 145 Md.App. 256, 297–98, 802 A.2d 1070 (2002).

As trigger theories have developed, so too has the case law pertaining to trigger and activation of insurance coverage for the insured due to the occurrence of an event or series of events, if there is demonstrable proof of a triggering event and an injury. In the case of *Harford Mut. Ins. Co. v. Jacobson,* 73 Md.App. 670, 536 A.2d 120 (1988), we reviewed a lead-induced injury case in which a tenant filed a personal injury suit against the estate of Israel Shapiro, which listed the rental property at issue as an estate asset. In *Jacobson,* evidence showed that the child tenant's injuries and diagnosis of lead poisoning took place prior to the inception of insurance coverage by appellant insurance company. *Id.* at 674, 536 A.2d 120. We were persuaded by cases that utilized the following test: "The date of an "occurrence" for purposes of determining coverage under an insurance policy is the date when the harm is first discovered." *Id.* at 684, 536 A.2d 120. As a result, we adopted the manifestation of injury trigger as a standard for lead paint cases and held the insurer was not liable to indemnify its former insured. *Id. See also Mraz v. Canadian Universal Ins. Co., Ltd.,* 804 F.2d 1325, 1328 (4th Cir.1986) (holding "that in hazardous waste burial cases ... the occurrence is judged by the time at which the leakage and damage are first discovered.")

The Court of Appeals began to chip away and depart from the *Jacobson* holding with its decision in *Lloyd E. Mitchell, Inc. v. Maryland Cas. Co.,* 324 Md. 44, 595 A.2d 469 (1991),

which was a case that involved injuries due to exposure to products containing asbestos. "Relying primarily on" the holdings in *Jacobson* and *Mraz,* the trial court found that the insurance company was not required to indemnify its former insured, a manufacturer of asbestos-containing materials, as a matter of law, where the alleged injuries did not manifest until after the general liability policies lapsed. *Id.* at 50, 595 A.2d 469. The Court vacated the trial court's entry of declaratory summary judgment for appellee insurer and held that the court erred in "adopting, as the *sole* trigger of coverage, the manifestation theory of coverage, namely, that coverage is not afforded until harm actually becomes manifest." *Id.* at 62, 595 A.2d 469. (emphasis in original). Significantly, the Court scrutinized the "plain meaning of the term 'bodily injury' " and concluded that because " 'bodily injury' occurs when asbestos is inhaled and retained in the lungs, ... at a minimum, coverage under the policy to provide a defense and indemnification of the insured is triggered upon exposure to the insured's asbestos products during the policy period by a person who suffers bodily injury as a result of that exposure." *Id.*

In 1992, the Court, in the case of *Harford County v. Harford Mut. Ins. Co.,* 327 Md. 418, 420, 610 A.2d 286 (1992), examined the issue of whether, "in the context of alleged environmental property damage," the applicable insurance policies are "triggered for the policy periods when the damages take place, as opposed to the policy period when the damages are first discovered or 'manifested.' " The environmental property damage occurred as a result of seepage and leakage from five of the county's landfills that contaminated the underlying groundwater over several years. *Id.* at 422, 610 A.2d 286. In rejecting the manifestation theory, the Court concluded:

> Notwithstanding the difficulty that may be encountered in determining exactly when contaminants from a landfill may cause property damage, we hold that "manifestation" is not the sole trigger of coverage in environmental pollution cases. Rather, we conclude that coverage under the policies

may be triggered during the policy period at a time earlier than the discovery of manifestation of the damage.

*Id.* at 435–36, 610 A.2d 286.

The decision of the United States District Court for the District of Maryland in the lead paint case of *Scottsdale Ins. Co. v. Am. Empire Surplus Lines Ins. Co.*, 811 F.Supp. 210 (D.Md.1993) further eroded the *Jacobson* adoption of the manifestation trigger theory. Although the Court was primarily charged with determining which insurance company was liable for contributing to the settlement amount for the injured child tenant, Judge J. Frederick Motz expounded upon the trigger issue and stated, "it is clear to me that the transition from *Mraz* to *Harford County* demonstrates that exposure plus bodily injury (even if unmanifested) is now sufficient under Maryland law to trigger coverage." *Id.* at 215.

We revisited the manifestation trigger theory in an asbestos-related injury case, *Mayor and City Council of Baltimore v. Utica Mut. Ins. Co.*, 145 Md.App. 256, 802 A.2d 1070 (2002). After reviewing the facts and the case law discussed above, we were persuaded to adopt the "injury-in-fact" trigger theory, as used in *Harford County, supra,* as the "appropriate trigger of coverage rule for asbestos-in-building property damages." *Id.* at 297, 802 A.2d 1070. We concluded that "[n]either the initial exposure (in this case the installation of asbestos in the City's schools), nor the discovery (manifestation) of the injurious effects of the ACBMs [Asbestos–Containing Building Materials], comports with the "occurrence" language of the CGL [Comprehensive General Liability] policies, which is predicated in part on "the continuous or repeated exposure to conditions" that is implicated by the continuing presence of asbestos in the City's buildings." *Id.* at 303, 802 A.2d 1070. Additionally, we specifically rejected trigger theories based upon manifestation, and held that use of the "injury-in-fact" theory would not "preclude coverage under subsequent policies when there is continued exposure." *Id.* at 297, 802 A.2d 1070. We reasoned:

The "injury-in-fact" and "continuous" trigger theories are not mutually exclusive, but instead may in an appropriate circumstance be complimentary in the appropriate context. As noted by the United States District Court for the Northern District of Ohio [in an environmental pollution case]:

> With one possible caveat, the appropriate trigger theory for this case is a continuous trigger rule that employs injury-in-fact as the initial triggering event.... The caveat ... is that in order to justify application of the continuous trigger rule, [the insured] has to show that the damage was continuing in nature, as opposed to one-shot or episodic. Otherwise, the policies will be triggered by injury-in-fact.

> *GenCorp., Inc. v. AIU Insurance Co.*, 104 F.Supp.2d 740, 746 (N.D.Ohio 2000).

*Id.* at 302–03, 802 A.2d 1070.

In the recent decision handed down by the Court of Appeals in *United Services Automobile Association v. Rita Riley, et. al.*, 393 Md. 55, 899 A.2d 819 (2006) (*Riley II*), the Court granted *certiorari* to determine the following issue: In a lead paint case, does a limit of liability provision in each of four liability policies limit the insurer's liability coverage to a single per occurrence limit when bodily injury spans more than one policy period?

In that case, as in this case, the landlord's insurer had brought a declaratory judgment action against the landlord and former tenants to determine whether the limits of liability for one policy were the limits of liability for lead-induced injuries suffered by the child tenants over four successive policy periods. The Court of Appeals reviewed our decision in *Riley v. United Services Auto. Association*, 161 Md.App. 573, 871 A.2d 599 (2005) (*Riley I*), in which we reversed the trial court's decision, holding that an expert's opinion regarding the bodily injuries that the children suffered was admissible on the trigger issue, despite the fact that there was no published

research on injury, if any, if a child has blood-lead levels below ten μg/dL. *Id.* at 587, 871 A.2d 599.

To guide the trial court on remand, we had responded to appellee insurer's question on cross-appeal: "Did the circuit court err in declaring that USAA's policies provided $600,000 of coverage, instead of $300,000?" *Id.* at 576, 871 A.2d 599. Regarding trigger of insurance coverage and successive policies, we followed *Utica Mutual, supra,* and agreed with the *Scottsdale* Court, concluding that "continuous injury, not solely manifestation, is the appropriate trigger in lead paint poisoning cases." *Id.* at 590. With respect to continuous injury triggering successive policies and the limits of liability under each policy, also known as stacking, we said:

The circuit court concluded that the policies' limit of liability provisions, while susceptible to the reading given by appellee, are equally susceptible to appellant's interpretation that, while any one policy would pay no more than $300,000 per occurrence, a continuing injury may trigger sequential policies, stacking each of the policies' liability caps. We agree, and again, we begin our analysis with a counterfactual.

In the underlying case, assume, *arguendo,* that the Carpenters win a total judgment of $3 million for injuries sustained during the four insurance periods, and further assume that Hooper had procured the four policies from four different insurers. In such a case, obviously each insurers' per-occurrence liability limits would not apply to limit the availability of coverage from the other policies; Hooper would have $1.2 million dollars of coverage toward his liability to the Carpenters.

Appellee's interpretation of the per occurrence liability limitation would alter the amount of insurance available, merely on the aleatory circumstance of whether Hooper had changed insurers over the course of the Carpenters' tenancy. Under our hypothetical, Hooper would enjoy the full benefit of the aggregate $1.2 million dollars of coverage he purchased; under appellee's theory, Hooper would only have $300,000 of coverage.

Appellee's interpretation is not compelled by the language of the insurance agreements. When the liability limitation section states, "Our total liability under Coverage E for all damages resulting from any one occurrence will not be more than" $300,000, it can be read to mean "total liability under *this policy*" rather than "total liability under all policies."

Additionally, because appellee's interpretation would substantially alter liability allocation in continuous injury cases, we believe appellee's interpretation is not what was expected by the parties when they made those contracts. *Cf. Scottsdale,* 811 F.Supp. at 216 ("[T]he purpose of the [limitation of liability] clause in question is not to apportion coverage between insurers providing coterminous coverage. Rather, it is to protect the issuing insurer from a claim that each instance of exposure constitutes a separate occurrence for which an independent claim up to the policy limits can be made."); *Utica,* 145 Md.App. at 310–11, 802 A.2d 1070 (indicating compelling force of parties' reasonable expectations in policy interpretation); Robert E. Keeton, *Insurance Law Rights at Variance with Policy Provisions,* 83 Harv. L.Rev. 961 (1970).

We also concluded that appellee insurer's theory on one occurrence under a single limit of liability for one policy ran "counter to the pro rata by time-on-the-risk allocation method adopted in continuous injury cases in Maryland." *Id.* at 592. *See Utica Mutual, supra,* 145 Md.App. at 309, 802 A.2d 1070 (holding "the obligation to indemnify the insured under the circumstances of this case, which involves continuing asbestos product property damage, is to be prorated among all carriers based on their time on the risk"); *see also Consol. Edison Co. of New York, Inc. v. Allstate Ins. Co.,* 98 N.Y.2d 208, 746 N.Y.S.2d 622, 774 N.E.2d 687 (2002) (New York Court of Appeals adopting pro rata allocation among several insurers in an environmental pollution case).

■ In affirming our decision in *Riley,* Judge Greene, writing for the Court of Appeals, concluded:

We begin our analysis with the language of the policies that are at issue. The limit-of-liability provision in each of the policies states:

Limit of Liability. Our total liability under Coverage E for all damages resulting from any one occurrence will not be more than the limit of liability for Coverage E as shown in the Declarations. This limit is the same regardless of the number of insureds, claims made or persons injured. All bodily injury and property damage resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of one occurrence.

There is no reference here to subsequent policies. The plain language of the policies defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, **during the policy period,** in bodily injury or property damage." (Emphasis added). While "policy period" is not defined within the "definitions" section of the policy, on the "Declarations Page" at the beginning of each policy the words "POLICY PERIOD" appear, followed by the dates that the policy covers. Each policy in the record contains a set "policy period." The customary, ordinary, and accepted meaning of a policy period is the period in time that is covered by the policy. It appears from the language of the contact that occurrences that happen during a policy period are covered. While USAA insists that its intent to prevent the stacking of multiple policies is clearly manifested in the language of the policy, it is clear that a reasonably prudent person could also read the policies to mean that each separate policy is implicated by a continuing occurrence. These contradictory interpretations of the same language clearly demonstrate the ambiguity in the policy. We find no error in the Circuit Court's determination.

USAA erroneously contends that *Hiraldo v. Allstate Insurance Company,* 8 A.D.3d 230, 778 N.Y.S.2d 50 (2004), *leave to appeal granted by Hiraldo v. Allstate Ins. Co.,* 4

N.Y.3d 704, 792 N.Y.S.2d 1, 825 N.E.2d 133 (2005), *aff'd,*
*Hiraldo ex rel. Hiraldo v. Allstate Ins. Co.,* 5 N.Y.3d 508,
806 N.Y.S.2d 451, 840 N.E.2d 563 (2005), addressed the
exact issue as in the instant case. In *Hiraldo,* a child was
exposed to lead paint chips and caused to suffer injury over
the course of several years and several homeowner's insur-
ance policy periods. *Id.* at 51. Allstate Insurance Compa-
ny insured the landlord of the premises where the infant
resided under a Landlord Policy. *Id.* The infant suffered
brain damage as a result of lead poisoning, which was first
diagnosed in August of 1991 when he was one year old.
Continuously elevated lead levels were found in the infant's
blood on seven occasions, with a final diagnosis in January
1993. *Id.* Allstate contended that, while it insured the
premises in question for a $300,000 liability limit per person,
and two subsequent renewal policies identical to the initial
policy, the provisions of the applicable policy clearly limited
the plaintiffs to the recovery of the limit of one policy
period, *i.e.,* $300,000. *Id.* The *Hiraldo* court held that the
plain language of the policy determined that the infant's
injuries arose out of a single occurrence and constituted one
loss, and Allstate "clearly intended to limit the number of
policies that would be available to satisfy a judgment in a
continuous exposure case." *Id.* at 51–52. Thus, the limits
of liability provision did apply.

The "Limits of Liability" provision in the policy in *Hir-*
*aldo,* while similar to the provision in the instant case,
contains one important difference. The provision reads:
"**Regardless of the number of** insured persons, injured
persons, claims, claimants **or policies** involved, our total
liability ... coverage...." *Hiraldo,* 778 N.Y.S.2d at 51
(emphasis added). Unlike the provision in the instant
case, the *Hiraldo* provision clearly indicated that liability
was limited regardless of the number of policies implicat-
ed. In the instant case, USAA made no reference to the
implication of the limit of liability provision in the event
of multiple policies. In its affirmance of *Hiraldo,* the
Court of Appeals of New York even cited to the interme-

diate appellate court's opinion in the instant case and distinguished it, noting that "[s]ome courts have held that successive policy limits may be cumulatively applied to a single loss, where the policies do not clearly provide otherwise.... *Riley v. United Servs. Auto. Assn.*, 161 Md. App. 573, 871 A.2d 599 [Ct.Spec.App. 2005]." This is clearly not the situation present in the instant case.

*Riley II*, 393 Md. at 80–82, 899 A.2d 819.

The foregoing quote from the decision of the Court of Appeals in *Riley II* is dispositive of the issue.

In light of the foregoing, patently, there is no reason to disturb the circuit court's ruling regarding multiple occurrences over a continuous period. The decision of the Court of Appeals in *Riley* makes clear that the law in Maryland is that, in cases such as the matter before us, proof of repeated exposure to lead, which, in turn, results in lead-based poisoning injuries that continue for several years with continuous exposure, the continuous injury or injury-in-fact trigger is applicable and thus triggers insurance coverage during all applicable policy periods. As we explained in *Utica Mutual, supra*, in rejecting the manifestation trigger in the context of asbestos-related injuries, the injury-in-fact trigger would not "preclude coverage under subsequent policies when there is continued exposure." *Utica Mutual*, 145 Md.App. at 297, 802 A.2d 1070. In that case, because "[t]he continued presence of [asbestos-containing building materials] in the buildings may cause continuous property damage during the coverage periods of policies that take effect subsequent to the moment that the City initially discovered the harmful effects of asbestos," we concluded that the continuous damage constituted an occurrence within each applicable policy period, so long as the asbestos remained in the buildings. *Id.* at 302, 802 A.2d 1070.

Appellant argues that the circuit court should have followed the Court of Appeals' decision in *CSX Transp., Inc. v. Cont'l Ins. Co.*, 343 Md. 216, 680 A.2d 1082 (1996), where the Court examined the propriety of the trial court's jury instructions in a case involving insurance claims by railroad workers suffer-

ing from noise-induced hearing loss (NIHL). Appellant's reliance on *CSX* is misplaced.

In *CSX*, the Court listed and discussed cases where courts have viewed occurrences as based upon the cause or causes of damage, and "not the number of injuries or claims." *Id.* at 233, 680 A.2d 1082. In its brief, however, appellant neglects to mention that the Court utilized this cause test because the insurance policy at issue contained language in the limit of liability provision that required further Court interpretation than the policy before this Court:

> For the purpose of determining the limit of [the insurance company's] liability, all personal injury ... arising out of continuous or repeated exposure to substantially the same general condition *existing at or emanating from one location or source* shall be considered as arising out of one occurrence.

*Id.* at 223, 680 A.2d 1082 (emphasis added).

The specific facts of that case, in addition to the unambiguous construction of the word "source" and its relation to "cause," led the *CSX* Court to hold that the trial court did not err in "excluding extraneous evidence to prove its meaning." *Id.* at 250, 680 A.2d 1082. The source of the injuries to the Jones children, however, is not at issue here. Additionally, the cause analysis [6] required in cases of NIHL is inapposite to

---

**6.** Chief Judge Bell penned:

> [W]hile it is true that all NIHL is caused by exposure to hazardous noise, it does not follow that each instance of NIHL is the product of one or more related exposures. To be sure, therefore, the NIHL suffered by each claimant was caused by hazardous noise and, in that sense, resulted from a common cause; however, the proximate cause of each individual case of NIHL may well be quite different, depending upon the source of the noise, the location at which the exposure occurred, the timing of the exposure, and, perhaps to some extent, the intensity of the exposure. It simply is not true that common cause is synonymous with proximate cause. This point is perhaps best made by drawing an analogy to the familiar context of automobile accidents caused by driver negligence. While driver negligence is the common cause of all such accidents, determining the proximate cause of a particular negligent driver's accident involves a factual

the analysis that courts undergo in lead paint poisoning cases in light of the continuous trigger theory.

Appellant also cites *Hiraldo v. Allstate Ins. Co.*, 8 A.D.3d 230, 778 N.Y.S.2d 50 (2004), *aff'd, Hiraldo v. Allstate Ins. Co.*, 5 N.Y.3d 508, 806 N.Y.S.2d 451, 840 N.E.2d 563 (2005), where the Appellate Division of the Supreme Court of New York, that state's intermediate appellate court, held an infant's lead-induced injuries arose out of a single occurrence, and coverage was limited pursuant to Allstate's policy limit of liability under one policy period.[7] As noted, *supra*, the Court of Appeals, in *Riley II*, rejected appellant's argument that *Hiraldo* was apposite because, there, the language of the policy limited liability, regardless, *inter alia*, of the number of policies involved.[8]

The New York Court of Appeals affirmed the intermediate court's holding to limit liability based upon the "noncumulation clause" contained in the Allstate policy, "[r]egardless of the number of ... policies involved." *Hiraldo*, 5 N.Y.3d at 513, 806 N.Y.S.2d 451, 840 N.E.2d 563. The Court held that, because Allstate provided the noncumulation of other policy language in the subject policy, it clearly limited its liability to the $300,000 cap of the one policy period under which the injury allegedly occurred, thereby precluding stacking of sev-

---

analysis of all the relevant circumstances, including the driver's specific negligence, where and when the accident occurred, etc. *CSX Transp., Inc.* at 248, 680 A.2d 1082.

**7.** The plaintiffs in *Hiraldo* sought to recover the judgment award from the underlying tort action of $555,000 from Allstate, but Allstate successfully argued it was only liable for the $300,000 liability limit contained in its policy. *Id.* at 51.

**8.** The policy provision at issue in *Hiraldo* reads:

This insurance applies separately to each insured person. *Regardless of the number of insured persons, injured persons, claims, claimants or policies involved, our total liability ... for damages resulting from one loss will not exceed the limit of liability [of $300,000].* ... All bodily injury, personal injury and property damage resulting from one accident or from continuous or repeated exposure to the same general conditions is considered the result of one loss.

*Id.* at 51 (emphasis added).

eral policies. *Id.*[9] As noted by the Court of Appeals in *Riley II*, no such clause or language appears in either of the CMC policies or the Hanson policies issued by appellant. Therefore, the *Hiraldo* cases do not apply to the case at bar.

Here, the Jones children were tested and found to have elevated blood-lead levels during their tenancy at the Property. The levels as shown, *supra*, demonstrate that the children suffered bodily injury, under insurance definitions, at several times throughout their tenancy, that spanned most of the years covered by appellant's policies. The levels remained dangerously elevated while the children were continuously exposed to flaking and chipping lead-based paint. The injuries suffered constitute occurrences under the policies and, in light of *Utica Mutual* and the decision of the Court of Appeals in *Riley*, each elevated level indicates a bodily injury, which would then constitute an occurrence under each insurance policy period that corresponds to the injury for each child. Consequently, the court did not err in reaching its conclusion.

### b. Policy Stacking

■ Our decision in *Utica Mutual*, and the decision of the Court of Appeals in *Riley II*, also compel us to hold that the court did not err in declaring that the policy provisions did not preclude stacking of the corresponding limit amounts of $500,000 each. As noted above, we have held that the injury-in-fact or continuous trigger did not preclude coverage under successive policies where there was proof of continued exposure and injury. Appellant cites cases in which courts have rejected stacking of liability limits; nonetheless, the cases are distinguishable.

Appellant refers us to *Ins. Co. of North America v. Forty–Eight Insulations, Inc. et al.*, 633 F.2d 1212 (6th Cir.1980), *clarified*, 657 F.2d 814 (6th Cir.1981), *cert. denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981), and *Keene Corp. v.*

---

**9.** Appellant also cites cases from the United States District Court, Southern District of New York, that were not published opinions. As such, we afford them no precedential value.

*Ins. Co. of North America,* 667 F.2d 1034 (D.C.Cir.1981), *cert. denied,* 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982), both asbestos-related injury cases where federal Circuit Courts of Appeal adopted a pro rata time-on-the-risk allocation and an "all sums" approach, respectively, to determine liability among insurers. We specifically rejected the all-sums approach [10] adopted in *Keene,* stating, "To compress long-term damage of a continuing nature into a single policy period, which would effectively be called for under the 'joint and several' or 'all sums' approach is 'intuitively suspect.'" *Utica Mutual,* 145 Md.App. at 311, 802 A.2d 1070 (citation omitted). With respect to *Forty–Eight Insulations, Inc.,* we referred to *Forty–Eight* when, in *Utica Mutual,* we "concluded that pro-rata allocation by 'time on the risk' is more consistent with the injury-in-fact/continuous trigger of coverage employed here". *Id.* at 313, 802 A.2d 1070.

What is particularly noteworthy is that these cases involved several insurance carriers and their duty to indemnify, whereas here, we are examining appellant's duty to indemnify in this matter as the sole insurance carrier. From a pro rata standpoint, appellant was on the risk here 100 percent of the time. The circuit court was not asked to declare which carrier as between appellant and several other insurance carriers was liable under its policy limits. Moreover, in *Utica Mutual,* we explained that we are not applying the "pro-rata allocation method employed by the New Jersey Supreme Court, which was proration on the basis of policy limits, multiplied by years of coverage." *Id.* at 314, n. 55, 802 A.2d 1070 (citation and internal quotation marks omitted). As a result, the court properly found that stacking of the liability caps was not precluded, so long as the Jones children are able to demon-

---

**10.** Under the all sums allocation theory, each policy from an insurer "promises full indemnification to the insured for all liability, 'all sums,' resulting from an occurrence." *Utica Mutual,* 145 Md.App. at 310, 802 A.2d 1070. Indeed, "[t]he standard CGL form generally provides that the insurer will 'pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages[.]'" *Id.* at n. 51.

strate continuous exposure and injury spanning the applicable policies.[11]

### c. Manifestation and the Known Loss Doctrine

Appellant asserts that *Jacobson* is still good law insofar as our conclusion that "any possibility of trigger *ends* upon manifestation. . . ." According to appellant, the cases decided subsequent to *Jacobson,* discussed *supra,* have abrogated the idea that manifestation of "an injury was the sole trigger of coverage," but nothing else. As a result, appellant avers that it should not have to indemnify Hanson and CMC under any policy where the Jones children's injuries manifested prior to the inception of coverage for a given policy. Additionally, in its Reply brief, appellant maintains that the continuous trigger theory "does not mandate coverage *after* manifestation." Appellant also claims that, because there is evidence that Holmes testified to notifying Hanson and CMC of the children's lead poisoning before the policies came into effect, that notice constituted known loss, precluding indemnification. Furthermore, judicial estoppel should prevent Hanson and CMC from contending that they were not put on notice of the lead poisoning. We are not persuaded by appellant's arguments.

■ We recognize that the decisions subsequent to *Jacobson* did not specifically hold that in every set of circumstances, adoption of the continuous trigger theory supplanted evidence of manifestation of an injury without proof of repeated exposure and injuries. Our application of the continuous trigger in these cases, lead-induced injury cases particularly, in effect, abrogated appellant's assertion also.

---

11. In a footnote, the circuit court stated, "If [Hanson and CMC] can establish an inability to determine technically how to attribute damages among each of the insurance periods, Maryland law dictates that the judgment be allocated pro rata among the policies based on their time on the risk." *See Bausch & Lomb, Inc. [supra,],* 355 Md. 566, 584–89, 735 A.2d 1081 (1999). In light of our discussion of pro rata allocation among several insurers above, we determine that the court mistook the Court of Appeals' holding in *Bausch & Lomb* concerning expert testimony to determine attribution of liability and our adopting pro rata allocation for deciding liability among several insurers.

Part of our reasoning for adopting the injury-in-fact/continuous theory was based on the special nature of environmental pollution cases that had a continuing or repeated exposure impact, such as cases involving asbestos or lead paint. In lead paint poisoning cases, like *Riley I* and *II* and the case *sub judice*, there was evidence that the injured parties had not only sustained an initial exposure to lead and a corresponding injury, but the repeated elevated blood-lead levels demonstrated that exposure continued over a period of time. It would logically follow that these tenants would also suffer new injuries as a result of the later episodes of exposure. Consequently, as we previously held, so long as the tenants were continually exposed and injured subsequent to the manifestation of their initial injuries, these novel injuries, with the requisite proof of exposure, would trigger coverage under sequential policies. Moreover, we have refused to apply any theory based in manifestation or discovery of an injury in conjunction with the continuous trigger theory within the context of lead-paint poisoning cases and, refuse to do so in this case.

In regard to the doctrine of known loss, we referred to the decision rendered by the Illinois Supreme Court, noting:

By its very nature, insurance is fundamentally based on *contingent risks* which may or may not occur.... If the insured knows or has reason to know, when it purchases a CGL policy, that there is a substantial probability that it will suffer or has already suffered a loss, the risk ceases to be contingent and becomes a probable or known loss [which is ordinarily uninsurable]. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill.2d 90, 103, 180 Ill.Dec. 691, 697, 607 N.E.2d 1204, 1210 (1992) (emphasis in original). As to the "known loss" and "fortuity" doctrines, the latter "holds that 'insurance is not available for losses that the policyholder knows of, planned, intended, or is aware are substantially certain to occur.'" The "known loss" rule is a variant, holding that an " 'insured may not obtain insurance to cover a loss that is known before the policy takes effect.'" *National Union Fire Ins. Co. of Pittsburgh,*

*PA. v. The Stroh Companies* 265 F.3d 97, 106 (2d Cir.2001) (citations omitted).

*Utica Mutual,* 145 Md.App. at 307, n. 49, 802 A.2d 1070.

 In the instant case, we agree with the court's ruling that the known loss doctrine is "not determinative of the availability of coverage for any of the applicable insurance policy periods." As we observed in *Utica Mutual,* the known loss defense is closely linked to the manifestation trigger theory. *Id.* at 306, 802 A.2d 1070. Because we have concluded that the manifestation trigger theory is inapplicable here, appellant's known loss argument also fails. Furthermore, we are persuaded by the assertion of counsel for Holmes and the Jones children that they, as plaintiffs in the underlying tort matter, intend to seek damages for separate injuries that occurred during the policy periods of successive policies. As such, Hanson and CMC's purported knowledge of injury and loss would have to be shown for each injury as averred by Holmes and the Jones children to preclude coverage. In light of the facts of this case, these circumstances further highlight the inapplicability of the known loss doctrine.

In addition, Hanson and CMC have always averred that they did not receive notice of the injuries allegedly suffered by the Jones children while tenants at the Property. For purposes of the declaratory action, the parties stipulated that, if Hanson or a CMC officer were called to testify, they would state that they did not become aware of the injuries to the Jones children until the tort complaint was filed in 1995. These stipulations simply fail to bolster appellant's case to establish known loss.

Assuming *arguendo,* that a judicial estoppel [12] argument was brought before the circuit court, *see Md. Rule* 8–131(a)(2006)

---

12. As Judge Salmon, writing for this Court, reiterated:

The doctrine of judicial estoppel "focuses on the connection between litigants and the judicial system." *Gordon v. Posner,* 142 Md.App. 399, 425, 790 A.2d 675 (2002). The doctrine of judicial estoppel provides that "[a] party will not be permitted to occupy inconsistent positions or to take a position in regard to a matter

(pronouncing that an "appellate court will not decide any other issue [except subject matter and personal jurisdiction] unless it plainly appears by the record to have been raised in or decided by the trial court . . . ."), appellant appears to mistake the assertions that were alleged by appellees to this action. As we stated, Hanson and CMC never changed their stance that they were not notified of the alleged injuries until the complaint filing. Holmes testified that she notified Hanson about the injuries at the onset of the exposure and, according to appellant, his 'knowledge' should be imputed to CMC. Her testimony, however, does not operate to modify the arguments of Hanson or CMC to, in effect, estop either from claiming that they did not have notice of these injuries prior to the inception of any coverage period. Therefore, we reject appellant's estoppel argument.

### d. Declaratory Judgment

█ Notwithstanding the fact that neither party raised this issue, we shall briefly discuss declaratory judgments and the court's Declaratory Judgment Order in the instant case. The stated purpose of a declaratory judgment is for trial courts to "settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations."

---

which is directly contrary to, or inconsistent with, one previously assumed by him, at least where he had, or was chargeable with, full knowledge of the facts and another will be prejudiced by his action." *Id.* at 426, 790 A.2d 675 (internal quotes omitted) (quoting *Stone v. Stone*, 230 Md. 248, 253, 186 A.2d 590 (1962)).

In *Middlebrook Tech, LLC v. Moore*, 157 Md.App. 40, 849 A.2d 63 (2004), we said:

Three factors "typically inform the decision whether to apply" the doctrine of judicial estoppel in a particular case: whether the party's later position is clearly inconsistent with its earlier position; whether the party succeeded in persuading the court in the earlier matter to accept its position, so that judicial acceptance of the contrary position in the later matter would create the perception that one of the courts had been misled; and whether the party seeking to assert the inconsistent position in the later matter would derive an unfair advantage, or would impose an unfair detriment on the other party, from being permitted to do so. *Id.* at 63, 849 A.2d 63.

*Abrams v. Am. Tennis Courts, Inc.*, 160 Md.App. 213, 225–26, 862 A.2d 1094 (2004).

Md.Code (2002 Repl. Vol., 2004 Supp.), Cts. & Jud. Proc. (C.J.), § 3–402. The Court of Appeals has explained:

[W]hen a declaratory judgment action is brought, and the controversy is appropriate for resolution by declaratory judgment, "the trial court must render a declaratory judgment." *Christ v. Department [of Natural Resources]*, 335 Md. 427, 435, 644 A.2d 34, 38 (1994). "[W]here a party requests a declaratory judgment, it is error for a trial court to dispose of the case simply with oral rulings and a grant of ... judgment in favor of the prevailing party." *Ashton v. Brown*, 339 Md. 70, 87, 660 A.2d 447, 455 (1995), and cases there cited.

The fact that the side which requested the declaratory judgment did not prevail in the circuit court does not render a written declaration of the parties' rights unnecessary. As this Court stated many years ago, "whether a declaratory judgment action is decided for or against the plaintiff, there should be a declaration in the judgment or decree defining the rights of the parties under the issues made." *Case v. Comptroller*, 219 Md. 282, 288, 149 A.2d 6, 9 (1959). *See also, e.g., Christ v. Department, supra*, 335 Md. at 435–436, 644 A.2d at 38 ("[t]he court's rejection of the plaintiff's position on the merits furnishes no ground for" failure to file a declaratory judgment); *Broadwater v. State*, 303 Md. 461, 467, 494 A.2d 934, 937 (1985) ("the trial judge should have declared the rights of the parties even if such declaration might be contrary to the desires of the plaintiff"); *East v. Gilchrist*, 293 Md. 453, 461 n. 3, 445 A.2d 343, 347 n. 3 (1982) ("where a plaintiff seeks a declaratory judgment ..., and the court's conclusion ... is exactly opposite from the plaintiff's contention, nevertheless the court must, under the plaintiff's prayer for relief, issue a declaratory judgment"); *Shapiro v. [Board of] County Comm.*, 219 Md. 298, 302–303, 149 A.2d 396, 399 (1959) ("even though the plaintiff may be on the losing side of the dispute, if he states the existence of a controversy which should be settled, he states a cause of suit for a declaratory decree").

*Harford Mut. Ins. Co. v. Woodfin Equities Corp.*, 344 Md. 399, 414–15, 687 A.2d 652 (1997), *recons. denied,* Feb. 11, 1997.

Furthermore, as the Court of Appeals has instructed:

... [T]he [trial] court must, in a separate document, state in writing its declaration of the rights of the parties, along with any other order that is intended to be part of the judgment. Although the judgment may recite that it is based on the reasons set forth in an accompanying memorandum, the terms of the declaratory judgment itself must be set forth separately. Incorporating by reference an earlier oral ruling is not sufficient, as no one would be able to discern the actual declaration of rights from the document posing as the judgment. This is not just a matter of complying with a hyper-technical rule. The requirement that the court enter its declaration in writing is for the purpose of giving the parties and the public fair notice of what the court has determined.

*Salamon v. Progressive Classic Ins. Co.*, 379 Md. 301, 308, n. 7, 841 A.2d 858 (2004) (citations omitted). *See also Md. Rule* 2–601(a)(2006) (mandating "[e]ach judgment shall be set forth on a separate document.")

We recognize that the court, as prayed, declared the rights of the parties as they relate to occurrences of the alleged injuries and the limit of liability provisions contained within the six insurance policies. The court also declared that stacking of the liability caps was permitted and that the doctrine of known loss, as espoused by appellant, was inapplicable to the case *sub judice.* What is absent, however, is a document, separate from and independent of, the court's judgment, as required by Rule 2–601(a) and mandated by the Court of Appeals.

Consequently, we remand the instant matter to the circuit court for it to issue a declaratory judgment on a document separate from its initial order and consistent with this opinion.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTI-MORE CITY AFFIRMED; CASE REMANDED FOR CIR-**

526

CUIT COURT TO ENTER DECLARATORY JUDGMENT CONSISTENT WITH THIS OPINION.

COSTS TO BE PAID BY APPELLANT.