*Pennsylvania National Mutual Casualty Insurance Company v. Tajah Jeffers et al.*, No. 960, Sept. Term 2017.  Opinion by Arthur, J.

**LIABILITY INSURANCE – PRO-RATA ALLOCATION**

In cases involving bodily injury resulting from continuous exposure to harmful substances, Maryland courts engage in a "pro rata by time-on-the-risk allocation" of liability among insurers.  Under this method, an insurer is liable for that period of time it was on the risk compared to the entire period during which damages occurred.  This method of calculating an insurer's pro rata share of a judgment obtained against its insured requires a court to identify a numerator (representing the insurer's coverage period, or time on the risk) and a denominator (representing the entire period in which the injured person suffered bodily injury).  The court then multiplies the resulting ratio by the total judgment amount to determine the insurer's pro rata share.

In this case, two plaintiffs had obtained judgments against an insured party.  One plaintiff experienced elevated blood-lead levels prior to her residence at a property owned by the insured.  Both plaintiffs continued to exhibit elevated blood-lead levels after moving out of the insured's property.  Here, the plaintiffs' period of injury is measured by the entire period in which they displayed elevated blood-lead levels, including when they did not reside at the insured's property.

**LIABILITY INSURANCE – *IN UTERO* DAMAGES**

While an unborn child may suffer bodily injury from exposure to lead while *in utero*, plaintiffs seeking to recover damages must present sufficient evidence to establish when any such injury began.  In this case, there was no evidentiary basis to conclude that the unborn child began to suffer bodily injury at any specific point while she was *in utero*.  Accordingly, the period before the child's birth was excluded from the calculation of the liability insurer's pro rata share of her judgment based on its time on the risk.

**LIABILITY INSURANCE – POST-JUDGMENT INTEREST**

A "standard interest clause" in an insurer's policy often states that the insurer will pay "[a]ll interest on the full amount of any judgment that accrues after entry of the judgment and before [it has] paid, offered to pay or deposited in court the part of the judgment that is within the applicable limits of insurance."  Under such a clause, an insurer is liable for all post-judgment interest accruing from the time the original judgment is entered, even if the insurer is not obligated to indemnify the insured for the entire judgment.  The insurer's obligation comes to an end when it pays, unconditionally offers to pay, or deposits into court the principal amount of its liability under the judgment.  The insurer need not tender all interest that it owes in order to toll its obligation for the payment of interest.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 960

September Term, 2017

_____

PENNSYLVANIA NATIONAL MUTUAL
CASUALTY INSURANCE COMPANY

V.

TAJAH JEFFERS ET AL.

_____

Berger,
Arthur,
Beachley,

JJ.

_____

Opinion by Arthur, J.

_____

Filed: January 31, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

This case involves two issues of insurance coverage that have arisen in the context of judgments for lead poisoning. The first issue concerns the extent of an insurer's duty to indemnify its insured for damages for continuous bodily injury that occurred before, during, and after the policy period, including bodily injury that may have occurred while a child was *in utero.* The second concerns the extent of an insurer's contractual obligation to pay "[a]ll interest on the full amount of any judgment" when it is obligated to indemnify its insured for only part of a judgment.

We shall hold that the insurer in this case was not obligated to indemnify the insured for bodily injury that occurred before its policy period began or after its policy period ended. Although we recognize that an unborn child may suffer bodily injury from exposure to lead while *in utero*, we shall hold that the evidence in this case was insufficient to establish when any such injury began, and thus insufficient to establish an obligation on the insurer's part. Finally, we shall hold that the insurer must pay post-judgment interest on the entire amount of the judgment even if it is obligated to indemnify its insured for only part of the judgment.

In view of those decisions, we shall reverse the judgment below in part, affirm the judgment in part, and remand the case for further proceedings consistent with this opinion.

FACTUAL AND PROCEDURAL BACKGROUND

**A. Hollins Street Property and Penn National Liability Insurance Policy**

Tajah Jeffers was born on July 9, 1992. She moved to 2116 Hollins Street in Baltimore with her parents on March 17, 1994.

Tajah resided at 2116 Hollins Street from March 17, 1994, until March 26, 1998, when her family moved into a certified lead-free home. She had blood-lead levels above the Centers for Disease Control and Prevention's reference level of concern of 5 µg/dL[1] from September 24, 1993 (before she moved into 2116 Hollins Street), until June 2, 1998 (after she moved out).

Tajah's sister, Tynae Jeffers, resided at 2116 Hollins Street from her birth, on November 8, 1996, until March 26, 1998. Tynae had elevated blood-lead levels from shortly after her birth until November 25, 1998 (after she moved out).

The following chart illustrates the blood-lead levels for Tajah and Tynae Jeffers at various points relevant to this case:

---

[1] Blood levels are measured in micrograms (µg) per deciliter (dL). A microgram is one-millionth of a gram; a deciliter is one-tenth of a liter, or about three fluid ounces. From 1990 to 2012, the CDC level of concern was 10 micrograms per deciliter. The level of concern is now five micrograms per deciliter.

| Tajah Jeffers | | Tynae Jeffers | |
|---|---|---|---|
| Date Taken | Blood-Lead Level (µg/dL) | Date Taken | Blood-Lead Level (µg/dL) |
| September 24, 1993 | 13 | May 14, 1997 | 4 |
| October 29, 1993 | 11 | September 17, 1997 | 6 |
| March 9, 1994 | 13 | May 1, 1998 | 22 |
| June 2, 1994 | 14-15 | November 25, 1998 | 8 |
| September 30, 1994 | 19-20 | | |
| March 24, 1995 | 13-14 | | |
| September 8, 1995 | 11-13 | | |
| May 1, 1996 | 11 | | |
| November 13, 1996 | 13 | | |
| May 14, 1997 | 11 | | |
| September 19, 1997 | 10 | | |
| June 2, 1998 | 7 | | |

The shaded areas of the tables show the children's elevated blood-lead levels when they were not living at 2116 Hollins Street.

Stewart Levitas and State Real Estate, Inc., owned, leased, and managed 2116 Hollins Street throughout the children's residency. Levitas and his company maintained a commercial general liability ("CGL") insurance policy issued by Pennsylvania National Mutual Casualty Insurance Co. ("Penn National"). The policy insured Levitas for the

3

period from November 27, 1991, through August 1, 1997.[2]  From August 1, 1997,

through August 1, 1998, Levitas was insured by CNA Reinsurance.[3]

In the insuring agreement in its policy, Penn National agreed "to pay those sums"

that Levitas became "legally obligated to pay as damages because of 'bodily injury' . . .

to which this insurance applies."  This agreement was qualified by a provision stating that

"[t]his insurance applies to 'bodily injury' . . . only if . . . [t]he 'bodily injury' occurs

during the policy period."  The policy gave Penn National "the right and duty to defend

any 'suit' seeking those damages."

### B.  Underlying Tort Action Against Levitas

On August 23, 2012, the Jeffers children filed suit against Levitas and his

company in the Circuit Court for Baltimore City.  The suit alleged that the children had

suffered injuries from lead exposure as the result of the negligent management of 2116

Hollins Street.  It appears that, pursuant to its obligations under the policy, Penn National

provided a defense.

After a five-day jury trial in November 2014, the jury returned a verdict against

Levitas, awarding $3,094,701.50 to Tajah Jeffers and $1,987,333.83 to Tynae Jeffers.

The judgments were initially entered on December 2, 2014.

---

[2] Levitas was insured by Penn National under Policy Number 230-0-00-71-80 during the following policy periods: (i) November 27, 1991, to November 27, 1992; (ii) November 27, 1992, to November 27, 1993; (iii) November 27, 1993, to November 27, 1994; (iv) November 27, 1994, to November 27, 1995; (v) November 27, 1995, to November 27, 1996; and (vi) November 27, 1996, to August 1, 1997.

[3] CNA Reinsurance did not participate in any of the proceedings below and is not a party to this appeal.

Because of the statutory cap on non-economic damages, Md. Code (1974, 2013 Repl. Vol.), § 11-108 of the Courts and Judicial Proceedings Article, the court issued a revised judgment in favor of Tajah Jeffers in the amount of $2,413,134.33 and in favor of Tynae Jeffers in the amount of $1,650,619.33. The date on which the revised judgments were entered was December 14, 2014.

Levitas appealed, but we affirmed in an unreported opinion, *Levitas v. Jeffers*, No. 2180, Sept. Term 2014, 2015 WL 9306757 (Md. Ct. Spec. App. Dec. 21, 2015). On April 25, 2016, the Court of Appeals denied Levitas's petition for a writ of certiorari.

### C. Declaratory Judgment Action Against Penn National

On May 16, 2016, the Jeffers children filed this suit in the Circuit Court for Baltimore City against Penn National and Levitas, to "collect on a final judgment" against Levitas. The children were able to bring a direct action against Levitas's insurer under Md. Code (1997, 2017 Repl. Vol.), § 19-102(b)(2) of the Insurance Article, which permits an injured party to bring an action against a tortfeasor's insurance company "for the lesser of the amount of the judgment recovered in the action against the insured or the amount of the policy" when the insured is insolvent.

As amended, the children's complaint alleged that Penn National had breached its contractual obligation under the policy by failing to indemnify Levitas for the "full amount" of the judgments. The children sought a declaratory judgment that Penn National's policy provides "insurance coverage for the entire amount" of the judgments.

In its answer to the complaint, Penn National asserted that it was obligated to indemnify Levitas only for the pro-rated portion of the damages that represented the

5

bodily injury that the children had suffered while Penn National insured Levitas.  Penn National denied that it was obligated to indemnify Levitas for the entire period during which the children had suffered bodily injury.[4]

## D.  Cross-Motions for Summary Judgment

Penn National moved for summary judgment.  Its motion asserted that, pursuant to *Mayor & City Council of Baltimore v. Utica Mutual Insurance Co*., 145 Md. App. 256 (2002), *cert. granted*, 371 Md. 613 (2002), *appeal dismissed*, 374 Md. 81 (2003), the insurer's liability to the Jeffers children was limited to its pro-rata time-on-the-risk, i.e., that its liability was limited to the ratio of "'th[e] period of time it was on the risk compared to the *entire* period during which damages occurred.'"  *Id*. at 313 (quoting *Domtar, Inc. v. Niagara Fire Ins. Co*., 563 N.W.2d 724, 732-33 (Minn. 1997)) (emphasis in original).  Penn National contended that the "period during which damages occurred" included (1) the period when both children had elevated blood-lead levels after they moved out of 2116 Hollins Street and (2) the period when Tajah Jeffers had elevated blood-lead levels before she moved into 2116 Hollins Street.

The Jeffers children opposed Penn National's motion and asserted a cross-motion for summary judgment on their own behalf.  They argued that, in Penn National's calculations of its pro rata share of the judgments, the insurer had erroneously diluted its

---

[4] Penn National also filed suit in the United States District Court for the District of Maryland against both Levitas and the Jeffers children, Case 1:16-cv-02060-CCB.  In that suit, Penn National sought a declaration that its responsibility for the final judgments extended only to its pro-rata time on the risk.  The federal district court stayed the case, pending the resolution of the circuit court case.

liability (1) by lengthening the period during which the children suffered bodily injury to include time before and after they resided at 2116 Hollins Street and (2) by discounting its liability for Tynae Jeffers's judgment by not including the bodily injury that she had allegedly suffered at 2116 Hollins Street while she was *in utero*. In the children's view, Tajah Jeffers's damages began only when she moved into 2116 Hollins Street and ended when she moved out, while Tynae Jeffers's damages began at instant of conception (when her mother lived at 2116 Hollins Street) and ended when she moved out.

The children also argued, briefly, that Penn National's obligation was not limited to its pro rata share of the judgments based on its time on the risk and that Penn National was obligated, instead, to indemnify Levitas for the full amount of the judgments.

In addition to challenging Penn National's positions concerning its liability for the judgments, the Jeffers children raised the issue of the insurer's responsibility for post-judgment interest. They invoked the so-called "standard interest clause" in Penn National's policy, which states, in pertinent part, that the insurer "will pay . . . [a]ll interest on the full amount of any judgment that accrues after entry of the judgment and before [it has] paid, offered to pay or deposited in court the part of the judgment that is within the applicable limits of insurance." Under the standard interest clause, the children asserted, Penn National was responsible to pay post-judgment interest on the full amount of the judgments from the time the original judgments were entered on December 2, 2014. In opposition, Penn National averred that it was obligated to pay post-judgment interest only on its pro rata share of the judgments.

7

On April 21, 2017, while the summary judgment motions were pending, Penn National made payments to the Jeffers children in accordance with its calculation of its liability on the judgments. Tajah Jeffers received a principal payment of $1,737,964.15 and an interest payment of $419,968.32, in accordance with Penn National's contention that it was liable for only about 72 percent of her $2,413,134.33 judgment and 72 percent of the post-judgment interest. Tynae Jeffers received a principal payment of $594,222.96 and an interest payment of $143,590.32, in accordance with Penn National's contention that it was liable for only 36 percent of her $1,650,619.33 judgment and 36 percent of the post-judgment interest. The Jeffers children accepted the payments without prejudice to their right to contend that Penn National had underestimated its liability.

### E. Judgment of the Circuit Court

On April 26, 2017, the circuit court held a hearing on the parties' cross-motions for summary judgment. On May 3, 2017, the court issued a written order, in which it calculated Penn National's liability on the judgments in accordance with the insurer's pro rata time on the risk.

In calculating Penn National's pro rata share of the judgments, the court was required, first, to identify a numerator (representing Penn National's time on the risk) and a denominator (representing the period in which each child had suffered bodily injury). The court was then required to multiply the resulting ratio or fraction by the total amount of the judgments to determine Penn National's pro rata share.

For the numerator in Tajah Jeffers's case, the court began with the date when she moved into 2116 Hollins Street (March 17, 1994) and ended with the date when Penn

8

National's Policy ended (August 1, 1997) – a period of 1233 days. For the denominator (the period in which Tajah suffered bodily injury), the court again began with the date when she moved into 2116 Hollins Street (March 17, 1994) and ended with the date when she moved out (March 26, 1998) – a total of 1470 days. Therefore, the court concluded that Penn National was responsible for 1233/1470 or 83.877551% of the judgment, totaling $2,024,007.98. The court also concluded that Penn National was responsible for post-judgment interest in the amount of $485,778.71, which represented 1233/1470 or 83.877551% of the interest that had accrued since December 2, 2014. The court rejected Penn National's contention that the denominator should be greater than 1470 (and thus that Penn National's pro rata share should be less than 1233/1470 of the judgment) because it should include the periods during which Tajah had elevated blood-lead levels before and after she lived at 2116 Hollins Street.

The court used a similar method to calculate Penn National's liability for Tynae Jeffers's $1,650,619.33 judgment. For the numerator in Tynae's case, the court began with her date of birth (November 8, 1996) and ended with the date when Penn National's Policy ended (August 1, 1997) – a period of 266 days. For the denominator, the court again began with her date of birth (November 8, 1996) and ended with the date when she moved out of 2116 Hollins Street (March 26, 1998) – a total of 503 days. Therefore, the court concluded that Penn National was responsible for 266/503 or 52.882704% of Tynae's judgment, totaling $872,892.13. The court also concluded that Penn National was responsible for post-judgment interest in the amount of $209,494.00, which represented 266/503 or 52.882704% of the interest that had accrued since December 2,

9

2014.  As it did with Tajah Jeffers, the court rejected Penn National's argument that the denominator should be greater than 503 days (and thus that Penn National's pro rata share should be less than 266/503 of the judgment) because it should include the period during which Tynae Jeffers had elevated blood-lead levels after she moved out of 2116 Hollins Street.  The court also rejected Tynae's argument that both the numerator and the denominator should include the period in which she had allegedly suffered bodily injury at 2116 Hollins Street while she was *in utero*.

The following chart compares the calculations proposed by Penn National and the Jeffers children and the calculations ultimately used by the circuit court:

| Tajah Jeffers | | | |
| --- | --- | --- | --- |
| | **Penn National** | **Jeffers** | **Circuit Court** |
| Numerator Start | Mar. 17, 1994<br><br>(move-in date) | Mar. 17, 1994<br><br>(move-in date) | Mar. 17, 1994<br><br>(move-in date) |
| Numerator End | Aug. 1, 1997<br><br>(date Penn National policy ended) | Aug. 1, 1997<br><br>(date Penn National policy ended) | Aug. 1, 1997<br><br>(date Penn National policy ended) |
| Denominator Start | Sept. 24, 1993 (first elevated blood-lead level) | Mar. 17, 1994<br><br>(move-in date) | Mar. 17, 1994<br><br>(move-in date) |
| Denominator End | June 2, 1998 (last elevated blood-lead level) | Mar. 26, 1998<br><br>(move-out date) | Mar. 26, 1998<br><br>(move-out date) |
| **TOTAL** | $\frac{1233 \text{ days}}{1712 \text{ days}} = 72\%$ | $\frac{1233 \text{ days}}{1470 \text{ days}} = 83.8776\%$ | $\frac{1233 \text{ days}}{1470 \text{ days}} = 83.8776\%$ |

| Tynae Jeffers | | | |
| --- | --- | --- | --- |
| | **Penn National** | **Jeffers** | **Circuit Court** |
| Numerator Start | Nov. 8, 1996<br><br>(date of birth or move-in) | Feb. 16, 1996<br><br>(estimated date of conception) | Nov. 8, 1996<br><br>(date of birth or move-in) |
| Numerator End | Aug. 1, 1997<br><br>(date Penn National policy ended) | Aug. 1, 1997<br><br>(date Penn National policy ended) | Aug. 1, 1997<br><br>(date Penn National policy ended) |

| | | | |
|---|---|---|---|
| Denominator Start | Nov. 8, 1996<br><br>(date of birth or move-in) | Feb. 16, 1996<br><br>(estimated date of conception) | Nov. 8, 1996<br><br>(date of birth or move-in) |
| Denominator End | Nov. 25, 1998<br><br>(last elevated blood-lead level) | Mar. 26, 1998<br><br>(move-out date) | Mar. 26, 1998<br><br>(move-out date) |
| **TOTAL** | $\frac{266 \text{ days}}{747 \text{ days}} = 36\%$ | $\frac{532 \text{ days}}{769 \text{ days}} = 69.181\%$ | $\frac{266 \text{ days}}{503 \text{ days}} = 52.882704\%$ |

In Tajah Jeffers's case, the circuit court concluded that Penn National was obligated to pay $2,024,007.98 as its pro rata share of the judgment and $485,778.71 as its pro rata share of the post-judgment interest. In Tynae Jeffers's case, the circuit court concluded that Penn National was obligated to pay $872,892.13 as its pro rata share of the judgment and $209,494.00 as its pro rata share of the post-judgment interest.

From those sums, the court subtracted the payments that Penn National had made on April 21, 2017.

In Tajah Jeffers's case, Penn National had paid $1,737,964.15 towards its pro rata share of the judgment and $419,968.32 in post-judgment interest. After subtracting those sums from its computation of Penn National's pro rata share of the judgment and the post-judgment interest, the court entered summary judgment in favor of Tajah for $286,113.83, plus $65,810.39 in interest from December 2, 2014, to April 21, 2017.[5]

---

[5] The court appears to have made an arithmetic error in computing Penn National's share of the judgment. The court concluded that Penn National was obligated to pay

(. . . continued)

12

In Tynae Jeffers's case, Penn National had paid $594,222.96 towards its pro rata share of the judgment and $143,590.32 in post-judgment interest. Therefore, the court entered summary judgment in favor of Tynae for $278,669.17 in principal ($872,892.13 minus $594,222.96) and $65,903.79 in interest ($209,494.11 minus $143,590.32) from December 2, 2014, to April 21, 2017.

The court ruled that post-judgment interest would continue to accrue on the unpaid principal amount of the judgment, but not on the unpaid interest, until Penn National paid, offered to pay, or deposited into court its total indemnification obligation. Nonetheless, the court decided that Penn National was obligated to pay post-judgment interest only on its proportional share of the judgments, and not on the full amount of the judgments.[6]

Penn National filed a timely motion to alter or amend the judgment, which the circuit court denied. Penn National then filed a timely notice of appeal to this Court, and the children noted a timely cross-appeal.[7]

---

(. . . continued)
$2,024,007.98, and Penn National had already paid $1,737,964.15. $2,024,007.98 minus $1,737,964.15 equals $286,043.83, not $286,113.83, as the circuit court said.

[6] In form, the court denied Penn National's motion and granted the children's cross-motion. In substance, the court granted Penn National's motion insofar as it agreed that the insurer was liable only for a pro rata share of the judgments based on its time on the risk, and not for the entire amount of the judgments (as the Jeffers children argued). The court also granted Penn National's motion insofar as it agreed that Penn National was obligated to pay only its pro rata share of the interest on the judgments.

[7] Levitas and his company had been defaulted and had not participated in the case. The court determined that the request for declaratory relief did not include Levitas and
(. . . continued)

13

Penn National poses three questions, which we have condensed and rephrased as follows:

1. In computing Penn National's pro rata share of the judgments based on its time on the risk, did the circuit court err in concluding that the period in which damages occurred (i.e. the denominator) ended when the Jeffers children moved out of 2116 Hollins Street, and not a later date when the children had their last elevated blood-lead levels?

2. In computing Penn National's pro rata share of Tajah Jeffers's judgment based on its time on the risk, did the circuit court err in concluding that the period in which damages occurred (i.e. the denominator) began when Tajah Jeffers moved into 2116 Hollins Street, and not on an earlier date when she first had elevated blood-lead levels?[8]

---

(. . . continued)

his company. For that reason, the court dismissed the claims against those parties. No party has challenged the method by which the circuit court disposed of those claims.

[8] Penn National phrased its questions as follows:

1. Did the Circuit Court Erroneously Determine Pennsylvania National Mutual Casualty Insurance Company's Indemnification Obligation on the Tajah Jeffers Judgment by Calculating the Denominator of the Pro-rata Time-on-the-risk Allocation Formula using the Date she Moved Out of the Property in Lieu of the Date of her Last Elevated Blood Lead Level?

2. Did the Circuit Court Erroneously Determine Pennsylvania National Mutual Casualty Insurance Company's Indemnification Obligation on the Tynae Jeffers Judgment by calculating the Denominator of the Pro-rata Time-on-the-risk Allocation Formula using the Date she Moved Out of the Property in Lieu of the Date of her Last Elevated Blood Lead Level?

3. Did the Circuit Court Erroneously Determine Pennsylvania National Mutual Casualty Insurance Company's Indemnification Obligation on the Tajah Jeffers Judgment by Calculating the Denominator of the Pro-rata Time-on-the-risk Allocation Formula using the Date she Moved Into the Property in Lieu of the Date of her First Elevated Blood Lead Level?

In their cross-appeal, the Jeffers children pose three questions, which we quote:

1. Did the circuit court err in deciding on summary judgment that *in utero* exposure to lead should not be included in the time on the risk calculation?

2. Did the circuit court err in finding that Penn National was only responsible to pay interest on its pro rata share of the judgments, as opposed to the entire judgments?

3. Is an all sums rule, such that Penn National is required to pay all sums that the insured becomes legally obligated to pay as damages, the applicable standard for determination of Penn National's indemnification obligation to Levitas pursuant to the language of the policy and the facts of this case?

For the reasons discussed below, we shall reverse the judgment in part, affirm the judgment in part, and remand for further proceedings consistent with this opinion.

## DISCUSSION

Maryland Rule 2-501(f) permits a court to grant a motion for summary judgment "if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." A trial court's grant of summary judgment is subject to *de novo* review on appeal. *Kennedy Krieger Inst., Inc. v. Partlow*, 460 Md. 607, 632-33 (2018). We review a declaratory judgment entered pursuant to a motion for summary judgment by "determin[ing] whether it was correct as a matter of law[,] . . . accord[ing] no deference to the trial court's legal conclusions." *Emerald Hills Homeowners' Ass'n, Inc. v. Peters*, 446 Md. 155, 161 (2016) (citation omitted).

15

## A. Trigger, Continuous Trigger, and Pro Rata Allocation

The analysis of this case requires a preliminary discussion of some of the basic principles pertaining to insurance coverage, and particularly coverage for claims of bodily injury under CGL policies.

We begin with the concept of "trigger of coverage." A liability insurance policy is said to be "triggered" upon the occurrence of an event that causes the policy to respond to a claim. *See Mayor & City Council of Baltimore v. Utica Mut. Ins. Co*., 145 Md. App. 256, 297 (2002) (quoting James M. Fischer, *Insurance Coverage for Mass Exposure Tort Claims: The Debate over the Appropriate Trigger Rule*, 45 Drake L. Rev. 625, 652 (1997)) ("'[t]rigger is a legal rule designed to determine when a policy must respond[]'"). Under a CGL policy, such as the policy that Penn National issued to Levitas, the occurrence of "bodily injury" may be a trigger. *See Riley v. United Servs. Auto. Ass'n*, 161 Md. App. 573, 583 (2005), *aff'd*, 393 Md. 55 (2006).

In this case, the Penn National policy defines "bodily injury" to mean "sickness or disease sustained by a person, including death resulting from any of these at any time." For coverage to attach under the policy, the "bodily injury" must be caused by an "occurrence," which is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." In addition, the bodily injury must "occur[] during the policy period."

In cases involving bodily injury resulting from continuous or repeated exposure to harmful substances such as asbestos or lead, Maryland courts employ what is called a "continuous trigger." *See, e.g*., *Maryland Cas. Co. v. Hanson*, 169 Md. App. 484, 510

16

(2006); *Riley v. United Servs. Auto. Ass'n*, 161 Md. App. at 589; *Mayor & City Council of Baltimore v. Utica Mut. Ins. Co.*, 145 Md. App. at 266, 302-03, 304-05.  In those circumstances, every policy that was in effect while the bodily injury occurred is triggered.  Because a continuous trigger may implicate several policies issued over several years by several different insurers, as well as periods in which the insured had no insurance at all, it often becomes necessary to allocate the amount of a judgment among the various insurers and, at times, the insured itself.

This case principally concerns the allocation of liability as between Penn National and its insured, Levitas, for the judgments that the Jeffers children obtained.  "In lead paint or continuous trigger cases such as this one, Maryland courts engage in a 'pro rata by time-on-the-risk allocation' of liability."  *Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Roberts*, 668 F.3d 106, 113 (4th Cir. 2012) (citing *Maryland Cas. Co. v. Hanson*, 169 Md. App. at 512; *Riley v. United Servs. Auto. Ass'n*, 161 Md. App. at 592; *In re Wallace & Gale Co.*, 385 F.3d 820, 835 (4th Cir. 2004)).  "Under this method of allocation, '[e]ach insurer is liable for that period of time it was on the risk compared to the *entire* period during which damages occurred[.]'"  *Id.* (quoting *Mayor & City Council of Baltimore v. Utica Mut. Ins. Co.*, 145 Md. App. at 313 (further citation omitted).

As previously explained, the calculation of an insurer's pro rata share of the judgment based on its time on the risk requires a court to identify a numerator (representing the time on the risk) and a denominator (representing the period in which the injured person suffered bodily injury).

17

**B. "All Sums"**

Before we proceed to review the circuit court's calculation of Penn National's pro rata share of the judgments based on its time on the risk, we must consider the Jeffers children's contention that we should employ an entirely different method to compute Penn National's liability. Relying principally on *Keene Corp. v. Insurance Co. of North America*, 667 F.2d 1034 (D.C. Cir. 1981), the children argue that because Penn National agreed to pay "those sums" that Levitas became "legally obligated to pay as damages because of 'bodily injury,'" Penn National must indemnify Levitas for the entire amount of the judgments against him (and thus must pay them the entire amount of the judgments). Penn National could then attempt to reduce its liability by pursuing claims of contribution against any other insurers that might have an obligation to indemnify Levitas or any tortfeasors who might be jointly and severally liable with Levitas for the judgments.

The short answer to the children's contention is that this Court rejected it in 2002 in *Utica Mutual*, because it is inconsistent with the language of the CGL policy. *See Mayor & City Council of Baltimore v. Utica Mut. Ins. Co.*, 145 Md. App. at 310-11. In a CGL policy, like the Penn National policy in this case, an insurer does not make an unqualified promise to pay all sums that its insured becomes legally obligated to pay as damages because of bodily injury. Instead, the insurer agrees to pay those sums that the insured becomes legally obligated to pay because of bodily injury *to which the insurance applies*. By its terms, a CGL policy, like the Penn National policy in this case, applies only to bodily injury that occurs during the policy period. *Id.* at 312. An insurer cannot

18

be required to indemnify its insured for an obligation that the insurer did not contractually agree to assume. *See Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Roberts*, 668 F.3d at 109 (stating that "an insurance company cannot be held liable for periods of risk it never contracted to cover"). Consequently, in determining an insurer's share of an insured's liability when the triggering event occurs on a continuous basis over an extended period of time, the *Utica Mutual* Court held that the insurer is liable, at most, for its pro rata share of the judgment based on its time on the risk. *See Mayor & City Council of Baltimore v. Utica Mut. Ins. Co.*, 145 Md. App. at 313.[9]

Although the Court of Appeals has not reviewed the holding in *Utica Mutual*, this Court has repeatedly reaffirmed that decision. *Riley v. United Servs. Auto Ass'n*, 161 Md. App. at 592; *see also Maryland Cas. Co. v. Hanson*, 169 Md. App. at 512. Furthermore, the federal courts, applying Maryland law, have treated *Utica Mutual* as settled law. *See, e.g.*, *Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Roberts*, 668 F.3d at 112; *In re Wallace & Gale Co.*, 385 F.3d 820, 833 (4th Cir. 2003); *Allstate Ins. Co. v. Rochkind*, 381 F. Supp. 3d 488, 511 (D. Md. 2019). In these circumstances, we decline to employ any allocation formula other than the insurer's pro rata share of the judgment based on its time on the risk.

## C. The Denominator in This Case

Penn National raises two objections to the circuit court's computation of the denominator (i.e., the period in which the Jeffers children experienced bodily injury).

_____

[9] We say "at most" because the insurer's liability is always subject to the definitions, conditions, and exclusions in its policy.

Penn National asserts, first, that the court erred in determining that the bodily injury ended as soon as the children moved out of 2116 Hollins Street despite the elevated blood-lead levels that they continued to experience for some time thereafter. Second, Penn National asserts that the court erred in excluding the bodily injury that Tajah Jeffers had suffered before she moved into 2116 Hollins Street, as evidenced by her elevated blood-lead levels from that period. We agree that the court erred in both respects.

**1**.

In their case against Levitas, the Jeffers children introduced evidence, through their expert, Dr. Charlene Sweeney, that they continued to suffer bodily injury after they moved out of 2116 Hollins Street. The injuries, which were evidenced by their elevated blood-lead levels, resulted from their previous exposure to lead at 2116 Hollins Street. But although that exposure had ended, the injury continued, because the children still had blood-lead levels that were sufficiently elevated to continue to cause damage at a cellular level.

This Court has recognized that "each elevated level indicates a bodily injury." *Maryland Cas. Co. v. Hanson*, 169 Md. App. at 518. Therefore, because the Jeffers children continued to have elevated blood-lead levels for some time after they moved out of 2116 Hollins Street, the court erred in failing to recognize that they continued to suffer bodily injury during that time. It follows that the court erred in rejecting Penn National's computations regarding the dates when the children's bodily injury ended: the court should have concluded that the bodily injury ended, at the earliest, as of the date of their

20

last elevated blood-lead levels (June 2, 1998, for Tajah Jeffers, and November 25, 1998, for Tynae Jeffers).[10]

The children assert that there is no evidence of their injurious exposure to lead after they moved out of 2116 Hollins Street. Their assertion is accurate, but immaterial. Levitas was liable in tort for the damages that the children continued to suffer even after they moved out of his property. Penn National, however, has no obligation to indemnify Levitas for that portion of the judgment, because the bodily injury did not occur within the Penn National policy period:

> The question before us . . . is not whether [Levitas] is liable for the entire . . . judgment, but whether Penn National is. And that question can be answered only by reference to the insurance contract, which necessarily involves the application of contract law.

*Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Roberts*, 668 F.3d at 114.

To the extent that Levitas had insurance coverage against claims of bodily injury suffered after the Jeffers children moved out of 2116 Hollins Street (as he did with the CNA Reinsurance policy), the children could look to that coverage in satisfaction of their judgments. To the extent that the bodily injury occurred after the Penn National policy ended, however, Penn National has no liability, because an "insurance company cannot be held liable for periods of risk it never contracted to cover." *Id*. at 109; *id*. at 112 (holding that, because the CGL policy provides coverage only for bodily injury that

---

[10] The children probably continued to suffer bodily injury even after their last elevated blood-lead levels, until they had eliminated more of the lead that had accumulated in their bodies during their residency at 2116 Hollins Street. Penn National, however, has not argued for a date later than that of the last elevated blood-lead levels.

21

occurs during the policy period, the policy, "[b]y its own terms," does not "cover damages [the insured] became legally obligated to pay for injuries that occurred outside of the policy period"). The circuit court, therefore, erred in ruling that the children's bodily injury ended when they moved out of the Levitas property on March 26, 1998, and not at the time of their last elevated blood-lead levels (June 2, 1998, for Tajah Jeffers, and November 25, 1998, for Tynae Jeffers).

In reaching its erroneous decision, the circuit court seemed to rely on the Jeffers children's contention that Levitas was held liable only for the injuries that the children suffered at that residence. The children find evidence for that contention in the verdict sheet, in which the jury found that Levitas "was negligent with respect to the property known as 2116 Hollins Street" and imposed damages on account of that negligence.

But to say that Levitas "was negligent with respect to the property known as 2116 Hollins Street" is not to say that the award of damages was somehow limited to the quantum of injury that the children suffered while they were living at that property. For purposes of this case, Levitas's negligence was relevant at all only to the extent that he was negligent with respect to the defective conditions at 2116 Hollins Street. As a result of his negligence, however, Levitas became liable for any damages that his negligence was a "substantial factor" in causing (*see, e.g.*, *Levitas v. Christian*, 454 Md. 233, 250 (2017)), whether the children suffered their damages at 2116 Hollins Street or somewhere else. Moreover, the children's expert, Dr. Sweeney, recognized that the clinical research did not allow her to divide the damage that a child had suffered at one location as opposed to another.

22

In these circumstances, the jury's award of damages had to account for all of the injury that the children suffered, regardless of where they lived when the injury occurred. It is, therefore, incorrect to say that, in the Jeffers children's lead-paint lawsuit, Levitas was held liable solely for the injuries that they suffered as a result of exposure to lead at 2116 Hollins Street.

**2.**

On three occasions before she moved into 2116 Hollins Street, Tajah Jeffers had blood tests that showed that she had elevated blood-lead levels. In light of those tests, the children's expert, Dr. Sweeney, agreed that Tajah "suffered an injury" from the elevated blood-lead levels "before she ever stepped foot in 2116 Hollins Street." In Dr. Sweeney's words, it was "not acceptable" for a child to have the elevated blood-level levels that Tajah experienced before she moved into the Levitas property.

Although the Jeffers children contend that the prior residences had no "deteriorated paint," they acknowledge that Tajah had "already suffered brain injury" before she moved into 2116 Hollins Street. Similarly, they assert that "Tajah Jeffers had prior lead exposure causing injury to her brain." In other words, the children concede that Tajah had suffered bodily injury from exposure to lead from some source before she moved into 2116 Hollins Street.

On the basis of the elevated blood-lead levels that Tajah Jeffers exhibited even before she moved to 2116 Hollins Street, and on the basis of Dr. Sweeney's expert testimony concerning those blood-lead levels, it is beyond dispute that Tajah had suffered some bodily injury from exposure to lead before she was exposed to chipping and flaking

23

lead-based paint at the Levitas property. Because "each elevated level indicates a bodily injury" (*Maryland Cas. Co. v. Hanson*, 169 Md. App. at 518), Tajah's bodily injury began on or before June 24, 1993, when she first had an elevated blood-lead level. The circuit court, therefore, erred in ruling that Tajah Jeffers began to suffer bodily injury only when she moved into the Levitas property on March 17, 1994. It follows that the court erred in rejecting Penn National's computation regarding the date when Tajah's bodily injury began: the court should have concluded that her bodily injury began, at the latest, on June 24, 1993, when she recorded her first elevated blood-lead level.

In arguing against reversal, the Jeffers children do not defend the circuit court's actual reasoning as much as they challenge the application of *Utica Mutual* to the facts of this case. Their arguments are redolent of their earlier contention that we should disavow *Utica Mutual*. The new arguments are equally unpersuasive.

The children argue, first, that no one has identified the tortfeasor whose conduct led to Tajah Jeffers's elevated blood-lead levels before she moved to 2116 Hollins Street.[11] The children then seem to assert that an insurer must indemnify its insured, regardless of when a bodily injury occurred, unless one can identify a joint tortfeasor who is jointly and severally liable with the insured for the bodily injury that the claimant suffered. But that is not what the policy says. Under the Penn National policy, as under

---

[11] Because the family's prior residence reportedly had no deteriorated paint, the children suggest that there was no tortfeasor, and that Tajah inexplicably wound up with blood-lead levels of 13 µg/dL before she even moved into the Levitas property. It is just as likely, however, that no one has any incentive to pursue other potential tortfeasors (including the family's prior landlords, as well as the owners of any other properties at which Tajah spent any significant amount of time) because they are impecunious.

24

any typical CGL policy, the insurer must indemnify the insured only for bodily injury that occurred during the policy period.  The existence of other tortfeasors is, therefore, immaterial to the insurer's contractual liability.  *See Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Roberts*, 668 F.3d at 109; *id.* at 112; *see also Riley v. United Servs. Auto. Ass'n*, 161 Md. App. at 594 (stating that "if [a child's] first exposure pre-dated [the insurer's] first policy, it may be that [the prior landlord], or whoever insured him at that time, is liable for that portion of the tort judgment attributable to that time period").

Citing no authority, the children also argue that *Utica Mutual* "does not apply" if the injured plaintiff had a "previous condition that made her more sensitive to tortious injury in the future."  They characterize Tajah as an eggshell plaintiff whose previous exposure to injurious levels of lead increased her susceptibility to injury when she was exposed to lead again at 2116 Hollins Street.  Thus, they assert that the award of damages compensated Tajah only to the extent that Levitas's negligence "*worsened* her prior cognitive status."  (Emphasis added.)  The children, however, cite no evidentiary basis for a conclusion that the earlier injury made Tajah Jeffers "more sensitive" to the consequences of lead exposure when she moved to 2116 Hollins Street.  To the contrary, the children's medical expert testified that Tajah Jeffers suffered a single, indivisible injury as a result of her exposure to lead.  The injury began before she moved into 2116 Hollins Street, and it continued after she moved out.  Under the law of torts, Levitas was liable for the entire, indivisible injury if his conduct was a substantial factor in causing it. *See Carter v. Wallace & Gale Asbestos Trust*, 439 Md. 333, 351 (2014) (concluding that "apportionment of damages is appropriate only where the injury in question is reasonably

25

divisible among multiple causes"). Under its insurance policy, however, Penn National is liable only for the pro rata portion of the injury that is attributable to the time when its policies were in effect. *Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Roberts*, 668 F.3d at 109; *id.* at 112.

The Jeffers children go on to argue that if Penn National is not required to indemnify Levitas for his liability for bodily injury that occurred before the Penn National policy period began, the effect is to "turn[] Tajah Jeffers into a joint tortfeasor." Their argument has no merit. Our decision does not turn Tajah Jeffers into a joint tortfeasor; it simply recognizes that Penn National has no duty to discharge her judgment against Levitas except to the extent of its pro rata liability for the portion of the injury that is attributable to the period when its policies were in effect. Tajah Jeffers is no more of a joint tortfeasor than any other judgment-creditor who has a judgment against an insolvent defendant with limited insurance coverage.

Finally, the Jeffers children argue that *Utica Mutual* applies only when a court allocates liability among insurers, or perhaps among insurers and an insured who chose not to obtain coverage for a particular period. The children are correct that *Utica Mutual* concerns a single tortfeasor (an installer of asbestos) that caused property damage over the course of several decades, during which it was insured by multiple insurers. Nonetheless, the foundational principle of *Utica Mutual* still applies here. The foundational principle is simply that under a CGL policy, an insurer must indemnify its insured only for the pro rata share of bodily injury or property damage that is attributable to its policy period. *Id.* at 109; *id.* at 112. Therefore, to the extent that the insured is

26

liable for bodily injury that occurs outside the policy period, the insurer has no duty to indemnify, whether the injury was caused by the insured alone or whether the insured is jointly and severally liable with others for the injury. As the Fourth Circuit explained:

> The rationale behind the pro rata approach bears no relation to the amount of tortfeasors in a particular case. "At the level of greatest generality," the pro rata method is based on the fact that "[a]n insured purchases an insurance policy to indemnify it against injuries occurring within the policy period, not injuries occurring outside that period." . . . . Pro rata allocation of liability is thus concerned with the length of a policy period, not the number of tortfeasors.

*Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Roberts*, 668 F.3d at 114 (quoting *Olin Corp. v. Insurance Co. of North America*, 221 F.3d 307, 322 (2d Cir. 2000)).

### D. Damages *In Utero*

In the circuit court, the Jeffers children argued that Tynae Jeffers had suffered bodily injury from exposure to lead while she was *in utero*, when her pregnant mother was living at 2116 Hollins Street. They posited that Tynae began to suffer bodily injury at the instant of conception. Their contention, if accepted, would have increased Penn National's pro rata share of the judgment because it would increase the number of days when Tynae was suffering bodily injury while the Penn National Policy was in effect.[12]

---

[12] In Tynae Jeffers's case, the Jeffers children argue that the numerator (Penn National's time on the risk) began on the posited date of conception (February 16, 1996, 38 weeks before the premature birth), and ended when the Penn National policy period ended (on August 1, 1997), for a total of 532 days. The circuit court concluded that the numerator began on the date of birth (November 1, 1996) and ended when the Penn National policy period ended (on August 1, 1997), for a total of 266 days.

The circuit court rejected the children's contention that Tynae Jeffers's bodily injury began while she was *in utero*. The children have challenged that ruling on appeal. We see no error.

Although there is no question that children may suffer injurious exposure to lead while they are *in utero* (*see, e.g.*, *Banks v. Fluor Corp.*, 450 S.W.3d 308, 328 (Mo. Ct. App. 2014); *see also Chantel Assocs. v. Mt. Vernon Fire Ins. Co.*, 338 Md. 131, 149 (1995)), the Jeffers children have no evidence about when the *in utero* exposure began in this case. They contend that Tynae was exposed because her pregnant mother tried to keep cool by eating ice chips near a sink that was surrounded by chipping and flaking paint, but they cannot say specifically when the ingestion occurred. To the extent that they have any unspecific evidence, it suggests that the ingestion did not occur until the dog days of summer, months after the putative date of conception (on February 16, 1996). Nor do the children endeavor to explain how their mother's exposure to lead could have injured the single-cell zygote that formed at conception, or how it could have injured the fertilized egg in the days before it attached itself to the mother's uterus, or how their mother's exposure could have injured the fetal brain before it developed. *See Banks v. Fluor Corp.*, 450 S.W.3d at 328 (observing, in affirming a judgment in favor of injured children and against the owner of a lead smelter, that "the most crucial and rapid time for brain growth and development is *during the last trimester of pregnancy* and the first five to seven years after birth") (emphasis added).

Simply put, we have a failure of proof. The Jeffers children gave the circuit court no evidentiary basis to conclude that Tynae Jeffers began to suffer bodily injury at any

specific point while she was *in utero*. The court, therefore, did not err in excluding the time when Tynae was *in utero* from the denominator in calculating Penn National's pro rata share of her judgment based on its time on the risk.

## E. The Standard Interest Clause

Under the "standard interest clause" in Penn National's CGL policy, the insurer generally agreed to pay "[a]ll interest on the full amount of any judgment that accrues after entry of the judgment and before [it has] paid, offered to pay or deposited in court the part of the judgment that is within the applicable limits of insurance." But despite its promise to pay "all interest" on the "full amount" of the judgments, Penn National argued that it was obligated to pay only a percentage of the interest, equal to its pro rata share of the judgments. The circuit court agreed with Penn National. We hold that the circuit court erred.

In determining the rights of the insured and the obligations of the insurer under an insurance contract, we apply the following well-established principles:

> We construe an insurance policy according to contract principles. Maryland follows the objective law of contract interpretation. Thus, the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract. When the clear language of a contract is unambiguous, the court will give effect to its plain, ordinary, and usual meaning, taking into account the context in which it is used. Unless there is an indication that the parties intended to use words in the policy in a technical sense, they must be accorded their customary, ordinary, and accepted meaning. Although Maryland does not follow the rule that insurance contracts should be construed against the insurer as a matter of course, any ambiguity will be construed liberally in favor of the insured and against the insurer as drafter of the instrument.

29

*Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 694-95 (2015) (internal citations, quotation marks, and emphasis omitted).

The "standard interest clause" is contained in a list of "supplementary payments" that Penn National agreed to make "with respect to any claim or 'suit'" that it defends. The supplementary payments include "[a]ll expenses" that the insurer incurs; "[t]he cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance"; "[a]ll reasonable expenses incurred by the insured" at the insurer's request to assist in the investigation or defense of a claim or "suit," subject to a limit of $100 per day for lost earnings; "[a]ll costs taxed against the insured in the 'suit'"; and "[p]rejudgment interest awarded against the insured on that part of the judgment" that the insurer pays. The supplementary payments are an example of how liability insurance is not just insurance against an adverse judgment, but insurance against the costs and expenses of litigation. Douglas R. Richmond, *The Subtly Important Supplementary Payments Provisions in Liability Insurance Policies*, 66 DePaul L. Rev. 763, 763 (Spring 2017); *see Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 409-10 (1975).

The vast majority of courts have held that, under the language of the standard interest clause, an insurer is liable for all post-judgment interest even if the insurer is not contractually obligated to indemnify the insured for the entire judgment. *See, e.g.*, *Fratus v. Republic W. Ins. Co.*, 147 F.3d 25, 28-29 (1st Cir. 1998) (umbrella policy applicable to a motor tort); *Nichols v. Anderson*, 837 F.2d 1372, 1377 (5th Cir. 1988) (automobile liability policy); *Safeway Ins. Co. of Alabama v. Amerisure Ins. Co.*, 707 So. 2d 218, 222 (Ala. 1997) (automobile liability policy); *Providence Washington Ins. Co. of Alaska v.*

*Fireman's Fund Ins. Cos*., 778 P.2d 200, 203-04 (Alaska 1989) (apparently involving a CGL policy); *Security Ins. Co. of Hartford v. Houser*, 191 Colo. 189, 192, 552 P.2d 308, 310 (1976) (automobile liability policy); *Aetna Cas. & Sur. Co. v. Protective Nat'l Ins. Co. of Omaha*, 631 So. 2d 305, 309 (Fla. Dist. Ct. App. 1993) (apparently involving a professional liability policy); *River Valley Cartage Co. v. Hawkeye-Security Ins. Co.*, 17 Ill. 2d 242, 245-46, 161 N.E.2d 101, 103-04 (1959) (automobile liability policy); *Davis v. Allstate Ins. Co.*, 434 Mass. 174, 181, 747 N.E.2d 141, 146 (2001) (automobile liability policy); *Matich v. Modern Research Corp.*, 430 Mich. 1, 26-27, 420 N.W.2d 67, 78 (1988) (apparently involving CGL insurance for products liability claims, as well as excess insurance); *Miller v. Secura Ins. & Mut. Co. of Wisconsin*, 53 S.W.3d 152, 156 (Mo. Ct. App. 2001) (automobile liability policy); *Draper v. Great Am. Ins. Co.*, 224 Tenn. 552, 560, 458 S.W.2d 428, 432 (1970) (garage liability policy); *Weber v. Biddle*, 4 Wash. App. 519, 529, 483 P.2d 155, 161 (Ct. App. 1971) (automobile liability policy); *McPhee v. American Motorists Ins. Co.*, 57 Wis. 2d 669, 677, 205 N.W.2d 152, 157 (1973) (automobile liability policy); *see also* Richmond, *supra*, 66 DePaul L. Rev. at 799 & n.264 (citing, among other cases, *Vazquez-Filippetti v. Cooperitiva de Seguros Multiples de Puerto Rico*, 723 F.3d 24, 29 (1st Cir. 2013); *Rockwell Automation, Inc. v. Nat'l Union Fire Ins. Co.*, 544 F.3d 752, 759-61 (7th Cir. 2008); *Southeast Atl. Cargo Operators, Inc. v. First State Ins. Co.*, 216 Ga. App. 791, 793-95, 456 S.E.2d 101, 103-04 (Ct. App. 1995); *Glenn v. Fleming*, 247 Kan. 296, 308-09, 799 P.2d 79, 87-88 (1990); *Burns v. Smith*, 303 S.W.3d 505, 514 (Mo. 2010); *In re Tichota's Estate*, 191 Neb. 484, 487-88, 215 N.W.2d 885, 887 (1974); *Weimer v. Country Mut. Ins. Co.*, 216 Wis. 2d 705,

721-22, 575 N.W.2d 466, 473 (1998)); *Holmes' Appleman on Insurance* 2d § 4894.25, at 78-79 (2004); *Couch on Insurance* 3d § 170.43, at 170-57 to -58 (1998).

Under the majority rule, the insurer remains liable for all post-judgment interest at least until it has paid or tendered the limits of its liability or deposited that sum into court. *See, e.g.*, *Draper v. Great Am. Ins. Co.*, 224 Tenn. at 560, 458 S.W.2d at 432; *Weber v. Biddle*, 4 Wash. App. at 527-29, 483 P.2d at 161; Richmond, *supra*, 66 DePaul L. Rev. at 805.

In holding that the standard interest clause requires an insurer to pay post-judgment interest on the entire amount of the judgment, and not just the amount within the policy limits, the courts have reasoned that the policy language is unqualified and unambiguous. *See Draper v. Great Am. Ins. Co.*, 224 Tenn. at 559, 458 S.W.2d at 432. The language "means what it says." Richmond, *supra*, 66 DePaul L. Rev. at 799; *accord Fratus v. Republic W. Ins. Co.*, 147 F.3d at 29 ("the policies mean what they say"); *see Powell v. T.A. & C. Taxi Co.*, 104 N.H. 428, 430, 188 A.2d 654, 655 (1963) (stating that "[t]he phrase 'all interest' does not connote the thought of some interest, or part of the interest on the judgment but rather all interest on the judgment whatever its amount in relation to the policy limit[s]"); *McPhee v. American Motorists Ins. Co.*, 57 Wis. 2d at 677, 205 N.W.2d at 157 (same). In short, "all interest" does not mean "some interest"; "all" means "all."

"This point is sharpened by the preceding paragraph in the standard CGL policy's supplementary payments provision, which limits the insurer's obligation to pay prejudgment interest awarded against the insured to that part of the judgment the insurer

32

pays." Richmond, *supra*, 66 DePaul L. Rev. at 799. "It is logical to conclude that the insurer could have similarly limited its post-judgment interest obligation if it wished to do so." *Id*. at 799-800; *accord Miller v. Secura Ins. & Mut. Co. of Wisconsin*, 53 S.W.2d at 157 (stating that "[h]ad [the insurer] intended to limit its post-judgment interest liability, it could have done so as it did with its prejudgment interest[]"); *River Valley Cartage Co. v. Hawkeye-Security Ins. Co.*, 17 Ill. 2d at 245, 161 N.E.2d at 103 (stating that the insurer "[o]bviously . . . knew how to qualify the term 'judgment' to achieve the result that it urges[,]" but "did not do so[]"); *Powell v. T.A. & C. Taxi Co.*, 104 N.H. at 430, 188 A.2d at 655 (same).

The same could be said about the insurer's obligation, in the supplementary payments section, to pay "[t]he cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance." *See Security Ins. Co. of Hartford v. Houser*, 191 Colo. at 192, 552 P.2d at 310; *McPhee v. American Motorists Ins. Co.*, 57 Wis. 2d at 677, 205 N.W.2d at 157. When it came to the subject of certain bonds, the insurer knew how to confine its obligations within the limits of its liability, but "[i]n the standard interest clause, it did not do so." *McPhee v. American Motorists Ins. Co.*, 57 Wis. 2d at 677, 205 N.W.2d at 157.

In the decisions endorsing the majority rule, the courts "not only apply the straightforward terms of the contracts, but produce sound policy." *Fratus v. Republic W. Ins. Co*., 147 F.3d at 29. Under a typical liability policy, the insurer controls the defense, and the insured ordinarily cannot require the insurer to pay the judgment or settle the case. *See, e.g*., *Security Ins. Co. of Hartford v. Houser*, 191 Colo. at 192, 552 P.2d at

33

310. Thus, "[c]ompelling the insurer to pay all of the interest which accrues pending appeal protects the insureds, who may wish to pay the portion of the judgment in excess of policy limits and stop the tolling of interest, but whose lack of control over the litigation prevents them from doing so." *Fratus v. Republic W. Ins. Co.*, 147 F.3d at 29. "The rule does not impose an unfair burden on insurers because they remain in control of both the tolling of interest and the litigation, and can fairly be expected to understand how the majority of jurisdictions interprets standard interest clauses." *Id.*; *see also Safeway Ins. Co. of Alabama, Inc. v. Amerisure Ins. Co.*, 707 So.2d at 222 (recognizing that "the insurer's control of whether post-judgment interest is incurred requires the insurer to pay such interest on the entire amount of the judgment"); *Powell v. T.A. & C. Taxi Co.*, 104 N.H. at 431, 188 A.2d at 655 (stating that "delay which causes interest to run, and the cost thereof should rest on the shoulders of the insurer who has complete control of the litigation and settlement"); *McPhee v. American Motorists Ins. Co.*, 57 Wis. 2d at 678, 205 N.W.2d at 158 (finding it "reasonable that the additional accumulation of interest caused by delay or trial tactics should be borne by the party causing the delay").[13]

Cases under the standard interest clause typically arise when a plaintiff has obtained an excess judgment – a judgment that exceeds the insurer's limits of liability. *See, e.g.*, *Security Ins. Co. of Hartford v. Houser*, 191 Colo. at 191, 552 P.2d at 309-10;

---

[13] "The rule also serves to protect plaintiffs from unreasonable delay on the part of insurers, or, as in this case, compensate them for such delays." *Fratus v. Republic W. Ins. Co.*, 147 F.3d at 29.

*Draper v. Great Am. Ins. Co.*, 224 Tenn. at 555, 458 S.W.2d at 430; *Weber v. Biddle*, 4 Wash. App. at 529, 483 P.2d at 161. We see no reason, however, why the analysis in those cases would not also apply when a plaintiff has obtained a judgment that exceeds the insurer's pro rata obligation to indemnify its insured based on its time on the risk, as the Jeffers children have done in this case. Penn National certainly does not argue that those cases do not apply here. Instead, Penn National argues that we should follow the small minority of cases that have held that the obligation to pay post-judgment interest requires the insurer to pay post-judgment interest only on the portion of the judgment that is within the insurer's limits of liability.

Penn National relies principally on *Standard Acc. Ins. Co. v. Winget*, 197 F.2d 97 (9th Cir. 1952), and *Sampson v. Century Indem. Co.*, 8 Cal. 2d 476, 66 P.2d 434 (1937). In both of those cases, however, the relevant policy language was materially different from the language in the Penn National CGL policy in this case.

Penn National's policy obligates it to pay "[a]ll interest on the *full amount* of any judgment." (Emphasis added.) By contrast, in the two cases on which Penn National principally relies, the policies obligated the insurers merely to pay "all interest accruing after entry of judgment." *Standard Acc. Ins. Co. v. Winget*, 197 F.2d at 106; *Sampson v. Century Indem. Co.*, 8 Cal. 2d at 477, 66 P.2d at 435. Because those policies (unlike the Penn National policy) pointedly failed to specify that the insurer was obligated to pay interest on the *full amount* of the judgment, the courts reasoned that the insurer was obligated to pay interest only on the portion of the judgment for which it was liable.

35

*Standard Acc. Ins. Co. v. Winget*, 197 F.2d at 107; *Sampson v. Century Indem. Co.*, 8 Cal. 2d at 479-80, 66 P.2d at 436.

So, for example, the California court interpreted the phrase "all interest accruing after entry of judgment" to mean "all interest on that part of the judgment for which the company was liable, and not all interest on the entire judgment." *Sampson v. Century Indem. Co.*, 8 Cal. 2d at 480, 66 P.2d at 436. It is, however, impossible to interpret the Penn National policy in that way, because Penn National expressly agreed to pay "[a]ll interest on the *full amount* of any judgment" – i.e., it agreed, in the words of the California court, to pay "all interest on the *entire* judgment." *Id*. (Emphasis added.)

Moreover, the California court reasoned that it "would not be justified" in "construing the policy" to make the insurer "liable for interest on any greater amount" than its limits of liability, "unless [the policy] contains language clearly expressing such an intention." *Id.* at 479, 66 P.2d at 436. But while the policy in *Sampson* contained no such language, Penn National's CGL policy plainly does: it makes Penn National liable for "[a]ll interest on the full amount of any judgment." Therefore, if the full amount of a judgment exceeds the limits of Penn National's contractual obligation to indemnify its insured, the standard interest clause obligates Penn National to pay interest on the full amount.[14]

_____

[14] A number of cases have indicated that, in the 1950s, in reaction to court decisions such as the ones on which Penn National principally relies, the insurance industry revised the standard policy language to make it clear that the insurer was liable for interest on the full or entire judgment until it paid or offered to pay the limits of its liability or deposited that sum into court. *See*, *e.g.*, *River Valley Cartage Co. v. Hawkeye-*

(. . . continued)

Penn National also relies on *Faulkner v. Smith*, 747 S.W.2d 592 (Ky. 1988), a divided decision that is almost devoid of reasoning. The majority opinion in that case briefly acknowledged "the majority and modern rule" that an insurer is liable for interest on the full amount of the judgment (*id.* at 593), but it did not cite (let alone discuss, analyze, or distinguish) even a single authority. The decision involves little more than *ipse dixit*. It would be hard to find a less persuasive appellate opinion.[15]

Finally, Penn National cites *Shnarch v. Empire Mutual Insurance Co*., 144 A.D.2d 795, 535 N.Y.S.2d 180, (1988), a slender, three-page opinion, in which one of New

---

(. . . continued)
*Security Ins. Co.*, 17 Ill. 2d at 245-46, 161 N.E.2d at 103-04; *McPhee v. American Motorists Ins. Co*., 57 Wis. 2d at 680-81, 205 N.W.2d at 159; *see also Security Ins. Co. of Hartford v. Houser*, 191 Colo. at 192, 552 P.2d at 310 (stating that "the insurance industry, itself, has always intended that the clause be interpreted to require payment of interest on the entire judgment, even though it exceeds policy limits"). At least one court has questioned whether the California court would reach the same decision under today's policy language as it did in 1937. *See Rockwell Automation, Inc. v. Nat'l Union Fire Ins. Co*., 544 F.3d at 760 (citing *Maxconn, Inc. v. Truck Ins. Exch*., 74 Cal. App. 4th 1267, 1279, 88 Cal. Rptr. 2d 750, 758 (Ct. App. 1999)).

[15] In any event, to the extent that the Kentucky court actually discusses the policy language in that case, the language appears to differ materially from the language of Penn National's CGL policy. In the Kentucky case, for example, the policy required the insurer to pay "all interest accruing after entry of judgment." *Id.* at 594. The language, therefore, did not expressly require the insurer to pay all interest "on the *full amount* of any judgment," as the Penn National policy does. Furthermore, at least as quoted by the Kentucky court, the policy language in that case did not limit the insurer's liability for pre-judgment interest to "that part of the judgment" that the insurer is obligated to pay, as the Penn National policy does. Nor does the policy language in the Kentucky case appear to limit the insurer's obligation for the cost of "bonds to release attachments" to the "bond amounts within the applicable limit of insurance," as the Penn National policy does. In concluding that an insurer must pay interest on the full amount of the judgment, and not just on the lesser amount of its indemnity obligation to its insured, courts rely, in part, on the standard policy language in which the insurer refers to its limits of liability to restrict the scope of its obligations to make other supplementary payments.

York's four intermediate appellate courts held that it was bound by *stare decisis* to conclude that an insurer was obligated to pay interest only on the insured portion of a judgment. *Id.* at 797, 535 N.Y.S.2d at 181-82. Like the Kentucky court, the New York court did not cite or discuss any of the many authorities nationwide on the issue. The court did acknowledge, however, that another New York appellate court in another department (or district) had reached the contrary conclusion. *Id.* at 796, 535 N.Y.S.2d at 181 (citing *Rodriguez v. Rodriguez*, 93 A.D.2d 748, 462 N.Y.S.2d 1 (1983)).

Given the paucity of authority in support of Penn National's position and the importance of ensuring a uniform interpretation of the standard language in CGL policies, we adopt the majority rule. Accordingly, we hold that the standard interest clause in Penn National's CGL policy required it to pay all interest on the full amount of the judgments against Levitas, and not merely interest on the portion of the judgments that it is contractually obligated to pay. That conclusion follows from the unqualified and unambiguous language in the policy itself ("[*a*]*ll* interest on the *full* amount of any judgment"); from the insurer's demonstrated ability to confine its obligation for other supplementary payments within the limits of its liability (as it did with its obligation to pay prejudgment interest and for the cost of certain bonds); and on the sound policy of requiring the party that controls the defense – the insurer – to bear the cost of refusing to pay a judgment during and after the pendency of an appeal.

Under the Penn National policy, the insurer remained liable for all interest on the full amount of the judgment until it "paid, offered to pay or deposited in court the part of the judgment that is within the applicable limits of insurance." A majority of courts have

38

held that post-judgment interest ceases to accrue against the insurer when the insurer pays, offers to pay, or tenders the limits of its liability on the judgment, even if the insurer does not pay, offer to pay, or tender the post-judgment interest that it owes. Richmond, *supra* at 805 & n.320 (citing *Vazquez-Filippetti v. Cooperitiva de Seguros Multiples de Puerto Rico*, 723 F.3d 24, 29 (1st Cir. 2013); *Cox v. Peerless Ins. Co.*, 774 F. Supp. 83, 87 (D. Conn. 1991); *Southern Gen. Ins. Co. v. Ross*, 227 Ga. App. 191, 193-94, 489 S.E.2d 53, 56-57 (Ct. App. 1997); *White v. Auto Club Inter-Ins. Exch.*, 984 S.W.2d 156, 159 (Mo. Ct. App. 1998); *Levit v. Allstate Ins. Co.*, 308 A.D.2d 475, 477, 764 N.Y.S.2d 452, 455 (2003)); *Draper v. Great Am. Ins. Co.*, 224 Tenn. at 561, 458 S.W.2d at 432. *But see Security Ins. Co. of Hartford v. Houser*, 191 Colo. at 193, 552 P.2d at 311 (holding that post-judgment interest continues to accrue until the insurer has tendered the limits of liability plus all accrued interest); *River Valley Cartage Co. v. Hawkeye-Security Ins. Co.*, 17 Ill. 2d at 246-47, 161 N.E.2d at 104 (holding that tender of policy limits, without tender of accrued interest on judgment, did not toll the accrual of interest); *Home Indem. Co. v. Muncy*, 449 S.W.2d 312, 316 (Tex. Civ. App. 1969) (holding that insurer's liability for post-judgment interest is not discharged unless its tender includes accrued interest).

We agree with the majority of courts that have held that the insurer's obligation comes to an end when it pays, offers to pay, or deposits into court the principal amount of its liability under the judgment. Thus, the insurer need not tender all of the interest that it owes in order to toll the accrual of interest on the judgment. "To hold otherwise would contravene the plain language of the policy" (Richmond, *supra*, 66 DePaul L. Rev. at

39

805), which simply states that interest ceases to accrue against the insurer when it pays, offers to pay, or deposits the "applicable limit of insurance."

In this case, Penn National paid $1,737,964.15 in principal to Tajah Jeffers and $594,222.96 in principal to Tynae Jeffers on April 21, 2017. The payments represented Penn National's computation of what was, in effect, the "applicable limit of insurance" where the insurer was liable for only a pro rata share of the judgments based on its time on the risk. We have held that Penn National's computations correctly reflected its liability on the judgments – i.e., that the computations correctly reflected Penn National's pro rata share of the judgments based on its time on the risk.

In contrast to an earlier payment that Penn National had proposed (and the children had rejected), the payments of April 21, 2017, were not merely an offer to settle a dispute. Rather, the payments were unconditional, in that Penn National did not demand a release in exchange for them and did not require the Jeffers children to abandon their contention that they were entitled to more. *See Davis v. Allstate Ins. Co.*, 434 Mass. at 183, 747 N.E.2d at 147-48 (collecting authorities for the proposition that an insurer must "make an unconditional offer to pay the policy limits in order to terminate its express obligation to pay postjudgment interest").

The circuit court held, however, that the two payments on April 21, 2017, did not terminate Penn National's obligation to pay post-judgment interest. The court appears to have based that decision on its conclusion that Penn National had not yet paid the full amount of its pro rata share of the judgments based on its time on the risk.

As we have explained above, the circuit court's conclusion was erroneous. In making the unconditional payments of April 21, 2017, Penn National correctly computed its pro rata share of the judgments based on its time on the risk. As of that date, therefore, Penn National terminated its obligation to pay all interest on the full amount of the judgments. Accordingly, we shall remand the case to the circuit court for a computation of Penn National's net liability for post-judgment interest from the date of the judgments against Levitas (December 2, 2014) until the date of Penn National's unconditional payment of its pro rata share of the judgments (April 21, 2017), after subtracting the partial payments that Penn National has already made toward its obligation to pay "all interest on the full amount of the judgment" ($419,968.32 to Tajah Jeffers and $143,590.32 to Tynae Jeffers).

## CONCLUSION

In summary, we hold that the circuit court erred in two respects in computing Penn National's pro rata share of the judgments based on its time on the risk. Both errors concerned the computation of the denominator (representing the period in which each child had suffered bodily injury).

First, the court erred in excluding the period in which both of the Jeffers children continued to suffer bodily injury from lead exposure (as evidenced by their elevated blood-lead levels) after they had moved out of 2116 Hollins Street. Second, the court erred in excluding the period in which Tajah Jeffers suffered bodily injury from lead exposure (as evidenced by her elevated blood-lead levels) before she had moved into 2116 Hollins Street.

41

The court, however, did not err in excluding the period in which Tynae Jeffers was *in utero* from its computations of Penn National's pro rata share of the judgments based on its time on the risk: the evidence was insufficient to establish when, if ever, Tynae Jeffers began to suffer bodily injury from exposure to lead while she was *in utero*.

The court also erred in two respects in its assessment of Penn National's liability for post-judgment interest. First, the court erred in determining that Penn National must pay post-judgment interest only on its pro rata share of the judgments, and not on the full amount of the judgments (as the Penn National policy states). Second, the court erred in determining that post-judgment interest continued to accrue after April 21, 2017, when Penn National made an unconditional payment of what we have determined to be the full amount of its pro rata share of the judgments.

We remand the case to the circuit court for a computation of Penn National's liability for post-judgment interest. On remand, the circuit court should enter an amended declaratory judgment that reflects these rulings, as well as its computation of Penn National's liability for post-judgment interest.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE EVENLY DIVIDED.**

42

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/0960s17cn.pdf